**AMERICAN HOME ASSURANCE COMPANY, Plaintiff,**

v.

**MERCK & CO., INC., Defendant,**

v.

**A.I. Marine Adjusters, Counterclaim Defendant.**

**No. 03Civ.3850(VM)(JCF).**

United States District Court, S.D. New York.

Oct. 26, 2006.

Joseph F. Fields, Jerold Oshinsky, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., New York, NY; Barry J. Fleishman, Dickstein, Shapiro, Morin & Oshinsky, LLP, Washington, DC, for Counter–Claimant Merck & Co., Inc.

Nooshin Namazi, Nicoletti, Horning, Campise, Sweeney & Paige, New York, NY, for Plaintiff American Home Assurance Co.

Anthony J. Pruzinsky, Hill, Rivkins and Hayden, New York, NY, for ThirdParty Defendant A.I. Marine Adjusters, Inc.

Paul C. Sullivan, Paul O. Sullivan, Dickstein, Shapiro, Morin & Oshinsky, LLP, New York, NY, for Merck & Co., Inc.

## DECISION AND ORDER

MARRERO, District Judge.

Before the Court are numerous motions in limine (the "Motions") submitted by plaintiff American Home Assurance Company ("American Home") and defendant Merck & Co., Inc. ("Merck") in connection with the trial of this matter on the issue of whether Merck is entitled to coverage for certain claims under a transit insurance policy (the "Transit Policy") issued by American Home.[1] The Court will briefly state the findings and reasoning supporting its decision regarding each separate Motion.

## I. MERCK'S MOTION TO SET THE ORDER OF PROOF AT TRIAL

█ Merck contends that while it is nominally the defendant in this action, the Court has already determined that Merck, as the insured, bears the burden "of proving facts that bring its claim within the

1. The relevant facts of this case are described in the Court's numerous opinions previously rendered in this case. *See American Home Assurance Co. v. Merck & Co.*, 329 F.Supp.2d 436 (S.D.N.Y.2004) *("American Home I");* American Home Assurance Co. v. Merck & Co., 2004 WL 2149103 (S.D.N.Y. Sept.24, 2004) *("American Home II");* American Home Assurance Co. v. Merck & Co., 354 F.Supp.2d 318 (S.D.N.Y.2005) *("American Home III");* American Home Assurance Co. v. Merck & Co., 376 F.Supp.2d 469 (S.D.N.Y.2005) *("Ameri-* can Home IV"); American Home Assurance Co. v. Merck & Co., 386 F.Supp.2d 501 (S.D.N.Y.2005) *("American Home V"); see also American Home Assurance Co. v. Merck & Co.*, No. 03 Civ. 3850, 2005 WL 1153723 (S.D.N.Y. April 13, 2005) (Report and Recommendation of Magistrate Judge James Francis, dated Apr. 13, 2005 *("American Home Report"));* American Home Assurance Co. v. Merck & Co., No. 03 Civ. 3850, 2004 WL 2222148 (S.D.N.Y. Oct. 4, 2004).

policy's affirmative grant of coverage. By contrast, the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense." *American Home V,* 386 F.Supp.2d at 515 (internal citations omitted). Merck argues that it is the party with the initial burden of proof and it should therefore go first at trial.

However, as the Court made clear, each party has the burden of proof on separate issues. Moreover, the Court has previously advised the parties that "in civil cases plaintiff presents opening arguments first and closing arguments last, unless the only disputes at trial arise from [defendant's] counterclaims." (*See* Endorsed Letter dated March 13, 2006). This action was initiated by American Home seeking a declaration of its rights under the Transit Policy and this question is still very much the central dispute in this action. Under such circumstances, it would unfairly prejudice American Home, the party that initiated this proceeding, if the Court were to realign the parties' presentations at trial. *See L–3 Communications Corp. v. OSI Systems, Inc.,* 418 F.Supp.2d 380, 383 (S.D.N.Y.2005) ("There is sound reason for placing the procedural burden of proof on the declaratory plaintiff in most cases despite his role as the real and traditional defendant. After all, it is the declaratory plaintiff who volunteers to bring the case in this forum at this time.") (internal citations omitted).

Consequently, Merck's motion is denied.

## II. *AMERICAN HOME'S MOTION TO BIFURCATE THE TRIAL*

American Home's motion is denied as moot since the Court has dismissed the bad faith claims that American Home sought to bifurcate.

## III. *EVIDENTIARY EXCLUSIONS*

Under Federal Rule of Evidence 401, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Only relevant evidence is admissible. *See* Fed. R.Evid. 402. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, of by consideration of undue delay, waste of time or needless presentation of cumulative evidence." Fed.R.Evid. 403.

The parties various Motions to exclude certain evidence are addressed below in accordance with these rules.

## A. *AMERICAN HOME'S MOTION TO PRECLUDE CERTAIN E–MAILS AND THE INSTRUCTIONAL HANDLING ADVICES*

■ American Home argues that (1) William Lang's ("Lang") e-mails, dated March 15 and 19, 2002, (2) Paul Ferguson's e-mail, dated April 19, 2002, (collectively, the "E-mails"), and (3) the Instructional Handling Advices dated August 2000 and June 2002 (collectively, the "Advices") should be precluded from evidence at trial. American Home argues that the E-mails and Advices are irrelevant to Merck's bad faith claim and their probative value, if any, is substantially outweighed by the danger of prejudice, confusion of the issues or misleading the jury.

The Lang e-mails evidence AIMA's (American Home's managing agent) frustration with Merck's failure to cooperate on loss control, and suggest "getting stubborn" and "tough" about paying certain high value fiberboard drum shipments.

The Ferguson e-mail is directed to Merck's broker, AON, and states that American Home "will not process any additional Merck losses unless physical damage to the product can be demonstrated." The two Advices inform the claim adjusters of the terms of the contract, and the 2002 Advice states that "after a rash of heavy claims activity ... the Assured is and should comply with the below obligations in the event of a loss.... Merck must demonstrate physical damage to the questioned property or goods. Merck has the obligation to minimize their loss ..."

Although the parties' papers focus strictly on Merck's bad faith claim in addressing the relevance and potential prejudice of the E-mails and Advices, the Court will address whether this evidence is relevant to Merck's breach of contract claim as well as Merck's breach of fiduciary duty claim against A.I. Marine. The Advices and E-mails are direct evidence of how American Home was interpreting the Transit Policy and thus clearly relevant to whether there was a breach of contract. As a prior opinion in this matter by Magistrate Judge Francis has already stated, "under Pennsylvania law, even where the contract is unambiguous, course of conduct evidence is always relevant in interpreting a writing." *See American Home Report,* 2005 WL 1153723 at *4 (internal citations omitted). This proposition is especially true here as both parties will be relying on their conduct under the contract as evidence of their understanding as to what was agreed. For example, American Home will be relying on its course of conduct with respect to loss control even though the contract itself makes no express mention of Merck's loss control obligations.

■ As they were distributed to A.I. Marine, the Advices and E-mails are also evidence that A.I. Marine was following American Home's instructions. If Merck demonstrates that A.I. Marine owed a fiduciary duty to Merck, then A.I. Marine's acting in accordance with American Home's directives may be probative of whether A.I. Marine may have breached that duty.

■ While the language of the E-mails (referencing getting "tough" on claims and doing "damage control") and the "Revised" caption on the 2002 Advice may create concerns regarding possible prejudice to American Home if introduced at trial, the Court regards the danger of prejudice to be substantially outweighed by the probative value of the E-mails and Advices.

For the foregoing reasons, American Home's Motion is denied.

B. *AMERICAN HOME'S MOTION TO PRECLUDE EVIDENCE OF PRIOR CLAIMS HANDLING AND THE RESPECTIVE CLAIM FILES*

■ American Home seeks to preclude evidence of prior claims submitted under the Transit Policy with similar facts to the Prototype Claims where American Home did not deny coverage. Again, the parties dispute the relevance and potential for prejudice with respect to Merck's bad faith claim. As this claim has been dismissed, the Court will address the relevance of this evidence with respect to the remaining claims.

As already stated, course of conduct under the contract is in fact relevant to a determination of the parties understanding of what was covered under the Transit Policy. While American Home argues that the prior claims Merck wishes to introduce to prove course of conduct were in fact paid by mistake, thus undercutting their relevance, this is precisely the type of factual issue which the trier of fact should decide. If the prior conduct was simply a

mistake which American Home eventually corrected, as it asserts, and the trier of fact credits it as such, then this evidence will not be given much weight. Regardless, the information is clearly relevant and its probative value outweighs any danger of potential prejudice.

American Home's Motion is denied.

## C. *MERCK'S MOTION TO EXCLUDE EVIDENCE OF MANUFACTURING COSTS*

■ Merck seeks to exclude any evidence relating to the actual manufacturing costs of the Active Pharmaceutical Ingredients ("APIs") at issue in Prototype Claims 2, 4, and 5. While the Court has already held, more than once, that the valuation clause of the Transit Policy is ambiguous and evidence of Merck's manufacturing costs are relevant, Merck nonetheless again argues to this Court, based on alleged new evidence produced in discovery, that Merck's manufacturing costs are irrelevant.

The Court agrees with American Home that Merck's motion is in large part a disguised motion for summary judgment, or a motion for reconsideration, and the Court again declines to address the issue. As the amount of coverage to which Merck is entitled for inter-company shipments of APIs is one of the material factual disputes in this litigation, and as American Home contends that the Transit Policy covers only Merck's manufacturing costs in such circumstances, evidence of what actually are Merck's manufacturing costs is directly relevant.

■ With respect to Merck's concerns that this evidence should also be excluded due to the danger of unfair prejudice and confusion of the issues, the Court does acknowledge that there is some potential for prejudice and confusion. The Court is mindful, as Merck points out, that drug manufacturers have been publicly criticized regarding their profits, and evidence of large dollar disparities between drug manufacturing costs and end market whole sale prices could result in the trier of fact, subconsciously or not, making certain negative inferences which could prejudice Merck. However, the Court disagrees that this potential for prejudice outweighs the probative value of the evidence. Moreover, any concerns can be addressed through appropriate limiting instructions if necessary. The cases cited by Merck where profit and cost information was excluded under Rule 403 involved circumstances where the evidence was marginally relevant at best. Here, such evidence is directly relevant to the claims.

Merck's Motion is denied.

## D. *MERCK MOTION TO EXCLUDE ALLEGATIONS OF PRICE FIXING AND TAX IMPROPRIETIES*

■ In addition to excluding evidence of the manufacturing information for the APIs in Prototype Claims 2, 4, and 5, Merck seeks to preclude American Home from alleging that the prices on the invoices that Merck relies on in seeking coverage under the valuation clause are not true commercial invoices that resulted from arms-length negotiation because the prices therein are set based on "tax avoidance considerations."

Merck argues that like the manufacturing cost information, such allegations are irrelevant and prejudicial. The Court disagrees. To the extent Merck will argue at trial that the prices set on the invoices at issue are based solely on market considerations, including end-market government price controls, and are thus true commercial invoices, American Home should not be precluded from countering with admissible evidence that may indicate the prices

set on the invoices are in fact based in part on profit shifting strategies among sister corporations designed to serve Merck's corporate interests.

Merck's Motion is denied.

### E. *MERCK'S MOTIONS TO PRE-CLUDE EVIDENCE OF FDA IN-SPECTIONS AND WARNING LET-TERS*

Merck argues in two separate Motions that American Home should be precluded from offering evidence of (1) a Food and Drug Administration ("FDA") inspection and warning issued to Merck's Puerto Rico facility in November 2000, and (2) FDA inspections of Merck's West point, Pennsylvania facility and related enforcement reports from 2001.

Both FDA inspections relate to Merck facilities involved in one or more of the Prototype Claims (the vaccines in Prototype Claim 1 were manufactured at the West Point facility and Prototype Claims 2, 4, and 5 were all shipped to the Puerto Rico facility). Both inspections cited Merck for various quality control problems. Merck seeks to exclude this evidence as irrelevant to the claims at issue. Merck also argues that the only purpose American Home could have in introducing such evidence would be to show prior bad acts by Merck and that such evidence is inadmissible under Federal Rules of Evidence 404(b) and 608(b).

American Home argues that this material contains relevant and probative rebuttal evidence in that American Home expects Merck to present itself as a "risk-adverse" company that must be very careful about the quality of its products due to the critical nature of their business, which is people's health. American Home anticipates that Merck will argue by reason of the nature of its business and its products, Merck necessarily had to be very strict in its "reasonable interpretation" of government regulations under the Control of Damaged Goods clause ("CDG Clause"), and was thus clearly reasonable in declaring the pharmaceuticals at issue in the Prototype Claims to be unfit. Consequently, American Home argues that Merck will have opened the door to evidence which undercuts Merck's portrayal of itself as an organization with a careful and fastidious corporate culture.

American Home's defense of the inspections and warnings as relevant rebuttal evidence is rather speculative at this point. Moreover, it does not appear that Merck's case will be centrally grounded on the premise that it is generally a careful and "risk-adverse" corporation. The relevance of evidence offered solely for the purpose of demonstrating a careless corporate culture is extremely tenuous and arguably of little probative value in comparison to the possible unfair prejudice. However, it would not be appropriate for the Court to preclude this evidence in its entirety at this time. Depending on the evidence and arguments Merck proffers at trial, evidence of quality control issues at two of the facilities connected with the Prototype Claims may in fact have some relevance. While Merck argues that the FDA inspections pre-date the Prototype Claims and that any issues cited by the FDA were addressed prior to the Prototype Claims, American Home argues otherwise. These inspections and the FDA's findings may be relevant to assessing the reliability of Merck's quality control determinations at the West Point and Puerto Rico facilities.

■ Regarding Merck's argument for exclusion under Federal Rules of Evidence 404(b) and 608(b), under the Second Circuit's "inclusionary" approach, evidence of other acts is admissible for any purpose other than the sole purpose of showing a

party's bad character, unless the evidence is overly prejudicial. *See Berkovich v. Hicks,* 922 F.2d 1018, 1022 (2d Cir.1991). If American Home is able to offer evidence of these FDA inspections for such other purpose, the evidence may be admissible. Finally, the Court is not convinced that the danger of unfair prejudice outweighs the probative value of this evidence.

Merck's Motions are denied.

### F. MERCK'S MOTIONS TO PRE-CLUDE REFERENCE TO UNRE-LATED LITIGATION AND REF-ERENCES LINKING CERTAIN MERCK VACCINES TO AUTISM

 Merck argues in two separate Motions that American Home should be precluded from (1) introducing evidence concerning the link between ingredients in Merck's infant vaccines and autism, and (2) restricting the use of the word Vioxx and precluding reference to Vioxx litigation. Again, American Home argues that this is relevant rebuttal evidence that demonstrates Merck's careless corporate culture.

The Court agrees with Merck that evidence of an alleged link between ingredients in a Merck infant vaccine and autism, as well as evidence relating to Vioxx litigation is not sufficiently relevant to the claims at issue and unduly prejudicial. In contrast to the FDA inspections, the only possible purpose for offering such evidence would be to generally prejudice the fact finder against Merck through insinuations that it is a careless corporate citizen. Neither the Vioxx litigation or the alleged autism link have anything at all to do with whether Merck reasonably interpreted FDA regulations in declaring the pharmaceuticals at issue to be unfit. This evidence will not make the existence of any fact of consequence more or less probable than it would be without the evidence. *See* Fed.R.Evid. 401.

 As the Vioxx litigation has received considerable public attention, Merck also argues that any reference to Vioxx itself be excluded, even though rofecoxib, which is involved in Prototype Claims 4 and 5, is the API in Vioxx. American Home contends that it will have to mention Vioxx to distinguish the API rofecoxib from the end-sale product. Merck is concerned that repeated references to Vioxx will prejudice the trier of fact and that it is not necessary for the fact finder to know the commercial name of the end-sale product in order to understand the difference between an API and the marketed drug.

While Merck's concerns regarding the mere mention of the word Vioxx may be overstated, as it is not necessary for American Home to use the word Vioxx to make clear the difference between the API and end-sale product, and as Merck is willing to stipulate that rofecoxib is the active ingredient in Vioxx, for purposes of trial the parties should be able to designate a innocuous name or generic description to replace any reference to Vioxx.

Merck's Motions are granted.

### G. MERCK'S MOTION TO RESTRICT TESTIMONY REGARDING THE FDA'S APPROVAL OF LABEL WARNINGS

 Merck seeks to preclude testimony asserting that the FDA's approval of the label warning ("DO NOT FREEZE since freezing destroys potency") on the vaccines at issue in Prototype Claim 1 (the "Vaccines") was improper. American Home responds, however, that it has no intention of challenging the FDA's approval of the label warning. American Home's experts will merely testify that the FDA was neutral on the issue of whether freezing required discard and that Merck's la-

bel should have in fact provided that discard was necessary only if stability data so indicated.

While Merck is correct that the trial of the claims at issue should not stray into whether the FDA's label approval was appropriate, it does not appear that American Home intends to make such an argument. American Home's experts argue that the data Merck submitted in support of its label statement on the vaccines was not sufficient with respect to the stability data generated at freezing temperatures. Consequently, Merck's assessment regarding the effects of freezing on the Vaccines at issue was not accurate. Such testimony is relevant and admissible.

Merck's Motion is denied.

## IV. EXPERT EXCLUSIONS

Rule 702 of the Federal Rules of Evidence allows a "witness qualified as an expert by knowledge, skill, experience, training or education" to testify if his "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Courts within the Second Circuit "have liberally construed expert qualification requirements" when determining whether a witness can be considered an expert. *TC Sys. Inc. v. Town of Colonie, New York,* 213 F.Supp.2d 171, 174 (N.D.N.Y.2002); *see also McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1042 (2d Cir.1995) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous."); *United States v. Brown,* 776 F.2d 397, 400 (2d Cir.1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule"); *Canino v. HRP, Inc.,* 105 F.Supp.2d 21, 27 (N.D.N.Y.2000) ("liberality and flexibility in evaluating qualifications should be the rule").

The Second Circuit has instructed that a trial court, in determining whether a witness is qualified to render an expert opinion, "must first ascertain whether the proffered expert has the educational background or training in a relevant field." *TC Sys.,* 213 F.Supp.2d at 174. Then the court " 'should further compare the expert's area of expertise with the particular opinion the expert seeks to offer [and permit t]he expert . . . to testify only if the expert's particular expertise . . . enables the expert to give an opinion that is capable of assisting the trier of fact.' " *Zwillinger v. Garfield Slope Housing Corp.,* No. 94 Civ. 4009, 1998 WL 623589, at *7 (E.D.N.Y. Aug.17, 1998) (*quoting* Federal Judiciary Center, Reference Manual on Scientific Evidence 55–56 (1994) (alterations in original)).

With this guidance in mind, the Court addresses each of the parties' Motions to preclude expert testimony.

### A. AMERICAN HOME'S MOTION TO PRECLUDE THE TESTIMONY OF ALAN JERVIS

American Home seeks to preclude the testimony of Merck's "insurance expert," Alan Jervis ("Jervis"), who Merck plans to have testify at trial about: custom and practice in the transit insurance industry; whether American Home acted in accordance with those industry customs and practices under the Transit Policy; whether American Home acted in bad faith as that term is understood in the industry; and the construction and meaning, as understood in the industry, of the Transit Policy and its provisions.

American Home asserts several challenges to Jervis's expert testimony. Specifically, American Home objects (1) generally to his credentials to testify as a transit insurance expert, (2) to the foundation for

448

his opinions to the extent Jervis relies on the report of the prior insurance expert retained by Merck, (3) to his opining on what constitutes bad faith, and (4) to his opining on the meaning of the Transit Policy clauses at issue in this action.

Regarding Jervis's credentials, while American Home argues that Jervis's relevant educational and professional experience is based in England and Canada, it appears that Jervis does have substantial experience dealing with transit insurance policies covering policyholders in the United States. The documents Merck has submitted in support of its expert indicate that Jervis has over twenty-five years of experience in the transit insurance business across the globe and has handled and adjusted over 12,500 transit claims during his career. The Court is persuaded that he has sufficient "specialized knowledge" to properly testify about transit insurance industry practices and customs. *See Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, No. 99 Civ. 1725, 2003 WL 1878246, *7 (S.D.N.Y. Apr. 11, 2003).

■ Regarding American Home's objection to Jervis's testimony to the extent it relies on the report of Merck's prior insurance expert (the "Stellwag Report"), American Home's concern is overstated. The cases cited by American Home, all from other circuits, take issue with an expert relying on or incorporating the findings of another expert without familiarity regarding the basis for that expert's findings. Here, Jervis reviewed all the underlying materials that informed the Stellwag Report and reached similar conclusions. Jervis's report then adds additional observations. Under such circumstances, there is nothing improper about Jervis incorporating Stellwag's findings in his report. To the extent American Home raises hearsay objections, the Court agrees with Merck that any such objections are

best dealt with at trial based on the actual questions and answers of the witness.

As for American Home's concerns regarding Jervis testifying on the issue of bad faith, as those claims against American Home have been dismissed, the Court need not address Jervis's qualifications on that subject as such testimony is no longer relevant to the remaining issues in this case.

■ American Home does, however, raise some legitimate concerns about Jervis's report and the areas he is likely to opine on at trial. Jervis's report proffers his readings of the CDG Clause, Sue and Labor clause, and the Valuation clause. In discussing these clauses, Jervis's report clearly impinges upon the province of the Court, in so far as he essentially proffers his own version of contractual interpretation. For example, Jervis argues that the CDG Clause takes precedence over the Sue and Labor Clause based on the principle that a more specific clause trumps a more general clause. (*See* Report, ¶ 75–76.) Although claiming that he cannot "speak to the legal interpretation," his opinion is in fact precisely that, despite his attempt to frame his interpretation as merely "a matter of claim adjusting practice." (*See id.*) "Expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of jury in applying the law to the facts before it by definition does not aid the jury in making a decision; rather it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir.2005). Thus, the Court will preclude Jervis from testifying as to his interpretation of the clauses at issue in the Transit Policy.

■ Testifying as a transit insurance expert, Jervis's testimony should be limited to what he understands to be the standard practices and customs of his business and what he regards as the standard expectations of insurer and insured. While Jervis may be an expert on customs and practices generally under transit insurance policies, he is not an expert on this Transit Policy, having had nothing to do with the negotiating, drafting or performance of it. Thus, absent sufficient basis for addressing this matter, Jervis cannot testify as to his understanding of the specific provisions of this policy or the import of specific words or phrases of various clauses therein. He may testify only generally, based on his experience and knowledge of the practices in the industry, as to the purpose of a Sue and Labor clause or a CDG clause.

Thus, American Home's Motion is denied in part and granted in part to the extent that Jervis is precluded from testifying regarding his opinion on the correct interpretation of the actual provisions in the Transit Policy.

B. *AMERICAN HOME'S MOTION TO PRECLUDE THE TESTIMONY OF LINDA WALKER*

■ American Home seeks to preclude the testimony of Linda Walker ("Walker"), an expert offered by Merck on the issue of whether or not the Vaccines at issue in Prototype Claim 1 *could have* frozen in transit on a refrigerated truck. American Home challenges Walker's credentials and argues that the majority of her offered opinions are speculative.

American Home notes that Walker did not even graduate from college and thus cannot be an expert on the refrigeration issues discussed in her expert report, and that she is certainly not qualified as a rebuttal expert to American Home's prof-

fered experts who hold Ph.D's in their respective fields. However, according to materials submitted describing her credentials, Walker has over 25 years of real world experience in the field of pharmaceutical packaging and temperature control. She spent 23 years as the Manager of Package Testing for a pharmaceutical company, has won professional awards including an award for vaccine packaging, and has spoken at industry and professional conferences on temperature measurement. The Court is persuaded that she has the requisite credentials to qualify as an expert.

■ American Home argues that Walker's experience does not qualify her as an expert on the WinTrac 4 system that measured temperature on the truck or the ThermoKing refrigeration unit on the truck. Moreover, American Home argues that Walker's opinions on the potential causes of the temperature excursion in the truck are entirely speculative.

Walker does not purport to be an expert on the design and operation of the systems on the truck at issue. She does purport to be an expert on the accuracy and reliability of temperature data generated by these systems based on her years of experience monitoring and analyzing such systems and their data output in both laboratory and field settings. She also purports to be an expert on the accuracy and reliability of the TempTale unit relied upon by Merck in its determination that changes in the temperature on the truck may have compromised the Vaccines. American Home does not appear to challenge Walker's qualifications on this point.

More fundamentally, American Home's emphasis on Walker's alleged speculation misses the point of her testimony. As the Court views the proffered evidence, Walker's presentation does not seek to prove

that the Vaccines did in fact freeze in transit, but merely that the readings from the TempTale gave Merck sufficient concern regarding the Vaccines to adequately support its determination to declare the Vaccines unfit for use. Thus, while American Home points to Walker's testimony acknowledging that she can only speculate regarding what actually happened inside the truck as well as the extent and effect of the temperature excursion, this is precisely Walker's point: based on her knowledge and experience, despite American Home's explanations, there are several potential causes for the temperature excursion and the problem with the in-transit data is that the information provided is insufficient to enable anyone to determine precisely what happened with sufficient certainty to disregard the problematic TempTale readings. As the fact finder will have to determine the reliability of the various temperature measurements on the truck as well as the likelihood that the vaccines may have frozen, the Court is satisfied that Walker's testimony as an expert on the data provided by the monitoring·systems will be of assistance to the trier of fact. Similarly, her testimony regarding the packaging of the vaccines, based on her experience in this area, will assist the trier of fact.

American Home's Motion is denied.

## C. *AMERICAN HOME'S MOTION TO PRECLUDE THE TESTIMONY OF STANLEY HEM*

■ American Home also seeks to preclude the testimony of Stanley Hem ("Hem"), who will testify regarding whether the Vaccines in Prototype Claim 1 were potentially unfit due to the possibility that they froze in transit. American Home does not challenge Hem's credentials, but again argues that his testimony should be precluded because his opinions are specu-

lative and not based on a reliable foundation. While Merck offers Walker to testify on whether the Vaccines could have frozen, it offers Hem to testify concerning the effect freezing could have had on the Vaccines.

American Home argues that because Hem cannot explain with certainty or demonstrate reliably exactly how freezing adversely effects the Vaccines, his testimony is speculative and therefore improper. As Hem readily points out, it is still unclear exactly how freezing effects alum adjuvated vaccines (the type of Vaccines in Prototype Claim One), and he freely admits that his explanation of the purported effect is in large part a theory. He also admits that freezing does not always have a negative effect on vaccine potency. However, Merck argues that it is not offering Hem's testimony to prove with scientific certainty exactly how freezing would have effected the Vaccines, but rather that he would merely opine "that the available data and existing scientific knowledge preclude certainty both as to the Vaccines' future performance and the reliability of American Home's proposed test methods." (*See* Merck & Co. Inc.'s Memorandum of Law in Opposition to American Home Assurance Company's Motion In Limine to Preclude Testimony of Dr. Stanley Hem ("Merck's Opp. Motion in Support of Hem"), p. 8.)

As with its opposition to Walker, American Home again argues that testimony should be excluded because it lacks a reliable foundation by pointing out what the proffered expert admits to not knowing. As with Walker, the flaw in American Home's position is that Hem merely argues that Merck had a reasonable basis for believing freezing *could have* compromised the Vaccines. Hem's testimony does not, therefore, lack a reasonable factual basis regarding the effects of freezing because

he does not purport to offer a definitive interpretation of those effects, but merely his expert opinion regarding the little that is known. As American Home does not challenge Hem's qualifications, there is no reason to doubt such testimony will assist the trier of fact. Nor is there any reason to doubt that Hem's testimony regarding the lack of reliability of American Home's proposed test to determine the potency of the Vaccines will not assist the trier of fact.

Consequently, American Home's Motion is denied.

## D. *AMERICAN HOME'S MOTION TO PRECLUDE THE TESTIMONY OF THOMAS BOZZO*

 American Home also seeks to preclude the testimony of Thomas Bozzo ("Bozzo"), whose expert testimony Merck intends to offer regarding the FDA's regulations as they relate to Merck's determination that the Vaccines in Prototype Claim 1 were unfit for use. American Home argues that Bozzo is not qualified to testify as an expert in this action and that his opinions are unreliable.

According to the materials submitted by Merck, Bozzo has approximately 40 years experience in the regulation of biological products and spent almost thirty years as a compliance officer at the Center for Biologics Evaluation and Research ("CEBR") and its predecessor, the FDA division that regulated biological products including vaccines. He was CEBR's Director of Compliance from 1988 to 1993. Nevertheless, American Home argues that Bozzo has insufficient experience in evaluating temperature excursions specifically for vaccine shipments to provide the necessary "reliable basis" for his opinions. While the parties dispute the extent of Bozzo's experience dealing with temperature excursions of vaccines, it is undisputed that

Bozzo is intimately familiar with FDA regulations relevant to the Vaccines. As Merck points out, the relevant FDA regulations do not even include temperature excursion specific provisions. Bozzo's testimony concerns the proper interpretation of generally applicable biological licensing FDA regulations, as well as drug product salvaging regulations. The Court is persuaded that Bozzo's testimony on these complex regulatory provisions will assist the trier of fact.

American Home's motion is denied.

## E. *AMERICAN HOME'S MOTION TO PRECLUDE THE TESTIMONY OF MARTHA BENNET*

 American Home seeks to preclude the testimony of Martha Bennet ("Bennet"), who Merck offers as its FDA regulatory expert with respect to Prototype Claims 2 through 6. American Home does not challenge her credentials, but does argue that her opinions are not grounded in "sufficient facts or data" as required by Federal Rule of Evidence 702. Additionally, American Home takes issue with Bennet's opinions on Merck's interpretations of applicable "regulations" under the CDG Clause in the Transit Policy to the extent she finds such determinations appropriate under certain "acts" or "guidance," as neither constitute "regulations," nor are they the provisions Merck has claimed reliance on in deeming the pharmaceuticals unfit. Therefore, American Home argues, her opinions are irrelevant to the claims in this action.

American Home does in fact point to relevant facts regarding the Prototype Claims that Bennet was either unable to recall or acknowledged that she had not reviewed or considered in preparing her report. For example, it appears Bennet did not review the testimony of the Merck employee who conducted the inspection of

the pharmaceuticals involved in Prototype Claim 3, which Merck deemed unfit for use due to their transport with chlorine gas containers in violation of Department of Transportation ("DOT") regulations, and that Bennet's report incorrectly noted that the customer allegedly smelled chlorine gas in the truck when in fact the truck never reached the customer. Based on Bennet's unfamiliarity with these and other facts and data, American Home argues that her testimony is not sufficiently reliable and should be precluded.

While Bennet may not have probed down into the facts to the extent American Home deems necessary, her opinions are based on the undisputed fact that there were irregularities in transit with respect to each of the Prototype Claims, *see American Home V,* and that based on those irregularities alone, certain bodies of law are implicated and relevant to Merck's decision to declare the pharmaceuticals unfit. To the extent American Home relies on facts which it believes undercuts the extent and nature of the irregularities alleged by Merck, cross-examination provides ample opportunity for American Home to challenge Bennet's opinions with those facts. The Court, however, is not persuaded that Bennet's unfamiliarity or misapprehension of certain details would render her testimony so disconnected from the facts of the case as to be insufficiently reliable. *See Sullivan v. Ford Motor Co.,* No. 97 Civ. 0593, 2000 WL 343777, *4 (S.D.N.Y. Mar. 31, 2000) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.").

■ Bennet's report references several bodies of law as relevant to Merck's determinations that the pharmaceuticals at issue in Prototype Claims 2 through 6 were unfit. American Home objects to her testimony in this regard for two reasons.

First, the CDG Clause allows Merck to deem property unfit if it does so "as a result of a reasonable interpretation of regulations promulgated by [any government regulatory body and/or agency]." American Home points out that Bennet bases her analysis regarding whether the pharmaceuticals were unfit "as a result of a reasonable interpretation of *regulations*" in part on the Food Drugs and Cosmetics *Act* ("FDC Act") with respect to Prototype Claim 3, and in part on the *"Guidance* for Industry, Q7A Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients" ("Q7A Guidance") with respect to Prototype Claims 2, 4, 5 and 6. American Home argues that because these bodies of law are not "regulations," they are irrelevant to the issues the trier of fact must decide, which is whether Merck's interpretation of applicable "regulations" was reasonable under the circumstances.

Second, and interrelated, is that American Home has understood it to be Merck's position throughout the course of this litigation that 21 C.F.R. § 211.208 ("Section 211.208") is the applicable regulation on which Merck relied in deeming the goods unfit. American Home argues that proffered expert testimony relying on bodies of law, however defined, that differ from Merck's own purported bases for seeking coverage will not assist trier of fact and the probative value, if any, is substantially outweighed by the danger of unfair prejudice and confusion of the issues.

Whether Merck may rely on "acts" or "guidance," and not just provisions formally termed "regulations," in interpreting goods unfit under the CDG Clause should not be resolved in the context of this Motion. It is a disputed factual question of interpretation of the CDG Clause to be resolved by the fact finder and informed by the intent of the parties. That Bennet's testimony would reference the FDC

Act or Q7A Guidance does not constitute adequate grounds to preclude her entire testimony on this subject at this point. American Home can point out the extent to which Bennet's testimony would relate to interpretation of "acts" and "guidance," and can present as part of its affirmative case, its argument that Merck cannot rely on "acts" and "guidance" in support of its interpretation because the CDG clause does not allow it. The fact finder can determine the weight to give that argument.

As to whether Merck should be allowed to proffer expert testimony discussing bodies of law that Merck has not specifically pointed to during the course of litigation, American Home essentially asks the Court to hold that Merck be limited to relying solely on Section 211.208 in making its case that it reasonably interpreted applicable government regulations. The Court declines to do so. The Court has previously stated in *American Home V*:

> Under the terms of the Policy, coverage will be triggered where *Merck's own* reasonable interpretation of relevant FDA regulations leads to a determination that covered property is unfit for use. While certain aspects of the FDA regulatory scheme are unambiguous or have been definitively interpreted by the FDA, other aspects of the FDA regulatory scheme governing the Prototype Claims remain ambiguous, including, among other questions, whether Section 211.208 ought to apply to the pharmaceuticals and circumstances involved in each of the Prototype Claims, and how various terms within the regulation ought to be defined. These ambiguities form a primary source of the conflicts between the parties ... Numerous court decisions have refused to punish private parties who have taken action based on a reasonable interpretation of an ambiguity in a complex regulatory scheme.... These decisions acknowledge that courts may be called upon to ascertain whether a private party's interpretation of a regulatory scheme is reasonable. That determination is the task that the Court, and ultimately, the fact finder, is instructed to perform by the [Transit] Policy in this case.

386 F.Supp.2d at 519 (internal citations omitted). The issue for the fact finder to decide is whether Merck's interpretation of the FDA's "complex regulatory scheme" was reasonable under the circumstances. The regulatory scheme referred to includes but is not exclusively limited to Section 211.208. Bennet's testimony will assist the fact finder in understanding this regulatory scheme, including testimony regarding any "acts" or "guidance" that are relevant to this scheme and may bear on the extent of Merck's reasonable reliance. Whether or not Merck has been correctly focusing on a particular provision in that scheme is not determinative of whether its interpretation was reasonable unless the record clearly indicates Merck specifically and exclusively relied on Section 211.208 in support of its determinations that the pharmaceuticals were unfit at the time it initially sought coverage. It is not the Court's understanding of the record and Merck's theory that this is the case. However, if American Home can make such a showing at trial, the Court would consider reopening this issue and limiting Bennet's testimony as appropriate.

American Home's Motion is denied.

## F. *MERCK'S MOTION TO PRECLUDE THE TESTIMONY AND STRIKE THE REPORT OF PATRICK BRECHT*

 Merck objects to the report and testimony of Patrick Brecht ("Brecht"), whose expert testimony American Home

offers on the issue of whether the Vaccines in Prototype Claim 1 could have frozen. Merck argues that Brecht is unqualified to testify on this subject because while his expertise is in the refrigerated trailer transport of perishable products, he is not an expert on the shipment or freezing of vaccines, or on the FDA regulations that informed Merck's decision regarding the Vaccines. Finally, Merck argues that Brecht is unable to provide the technical basis for several of his opinions.

With respect to Brecht's credentials and experience, there is no dispute that he is imminently qualified regarding the refrigerated trailer transport of perishable goods. Merck argues, however, that his background does not make him an expert on the refrigerated transport of vaccines. American Home responds that Brecht does in fact have extensive experience dealing with the transport of pharmaceuticals, including vaccines. Regardless, a review of Brecht's report makes clear that his focus is on the temperature monitoring systems on the truck at issue and whether Merck correctly evaluated, validated and relied on the data from those systems. He is clearly qualified to testify on this subject.

However, to the extent Brecht concludes that Merck "wrongly earmarked for 'discard'" the Vaccines (*see* Report of Dr. Patrick Brecht, dated Oct. 8, 2004 ("Report"), p. 19), Brecht is arguably exceeding the proper bounds of the subject matter on which he is qualified to testify. He should not provide his opinion on what is really the ultimate issue for the fact finder to determine, particularly taking into account that he does not attempt to opine on the FDA regulations that Merck was required to abide by in making its determination to discard the Vaccines. However, Brecht's analysis, based on his expertise and review of the temperature data systems and facts

of the Vaccine transport, can properly be offered on the issue of whether Merck "discounted or ignored the available data and thus failed to make a proper and informed decision...." (*See* American Home's Memorandum of Law in Opposition to Merck's Motion In Limine to Preclude Testimony and to Strike the Report of Dr. Patrick E. Brecht, Ph.D ("American Home Opp."), p.6).

■ Merck argues that Brecht's testimony is not helpful regarding whether Merck made a proper and informed decision because Brecht is not an expert on the FDA regulations, and that the relevant issue at trial is not whether or not the Vaccines did in fact freeze, but whether the Vaccines had been subject to improper storage conditions *under FDA regulations*. While Merck is correct that whether its determination based on FDA regulations was reasonable is the ultimate issue at trial, American Home can avoid liability if it can demonstrate that Merck's evaluation of the available evidence regarding the temperature excursion was improper and uninformed based on Merck's duties to act prudently under the Sue and Labor Clause. *See American Home V,* 386 F.Supp.2d at 517. Thus, the Court has already indicated that whether the Vaccines could have frozen is a material issue for trial. *See id.,* at 520. It is therefore clearly a relevant issue on which Brecht can testify.

Finally, with respect to Merck's contention that Brecht does not provide an adequate technical basis for his expert opinions, the Court finds Merck has overstated the issue. To the extent Merck challenges the basis for some of Brecht's conclusions, Merck can appropriately raise its objections on cross examination.

Merck's Motion is denied.

G. *MERCK'S MOTION TO PRE-CLUDE TESTIMONY FROM LINDA MOTKYA CONCERNING TOPICS ADDRESSED IN (1) SECTIONS 2.3, 2.5 AND 2.6 OF HER EXPERT REPORT AND (2) HER EXPERT REPORT IN REBUTTAL TO STANLEY HEM*

■ Merck seeks the preclude testimony of Linda Motkya ("Motkya") concerning certain sections of her reports on the grounds that she is not qualified as an expert on vaccines or the temperature issue on which she opines, that she formulated her opinions expressly for this litigation, and that her opinions on the vaccines and freezing issues lack a reasonable scientific basis.

American Home offers Motkya as an expert on the interpretation and application of FDA regulations to Prototype Claim 1. According to the materials American Home submitted, Motkya has a Ph.D in organic chemistry and twenty years experience "in the pharmaceutical industry including the areas of chemistry and manufacturing, regulatory affairs, drug development, and structuring manufacturing and quality control departments for compliance with Good Manufacturing Practices." (Expert Report of Linda Motkya, dated October 5, 2004 ("Motkya Report"), p. 4). While Merck does not challenge Motkya's credentials or opinions as a regulatory expert, Merck contends that to the extent she opines on whether (a) Merck improperly evaluated the available data regarding the temperature excursion and the Vaccines and (b) improperly failed to do potentially reliable sample testing to determine if Vaccines were in fact compromised, Motkya should be precluded from testifying on these matters because she has no special expertise in the properties of vaccines and the effect of temperature changes on vaccines.

With respect to Sections 2.3, 2.5 and 2.6 of her report—where Motkya discusses Merck's available data on freezing points, its packaging technology excursion testing and a possible sampling plan—a close reading of the document indicates that her analysis is presented from a quality control perspective. Motkya carefully reviews the decisions made by Merck based on the data Merck had available to it regarding previous vaccine temperature excursion testing, argues that Merck should have had more comprehensive data on each specific vaccine's freezing point, and suggests a possible quality control test based on Merck's prior temperature excursion testing. The Court is persuaded that the analysis Motkya proffers, as an expert on quality control and FDA regulations on good manufacturing practices, will assist the trier of fact in weighing whether Merck properly evaluated the alleged temperature excursions and their potential effect on the Vaccines.

■ Merck's objections regarding Motkya's actual expertise, however, are not entirely meritless. For example, in rebuttal Motkya argues for the reliability of the "shake test," despite not having clearly demonstrated actual expertise regarding the effectiveness of this test in determining a vaccine's potency. As Merck accurately points out, it does not deny that Merck could have done the shake test or that the World Health Organization recommends it in certain circumstances. The issue here, however, is whether the "shake test" is scientifically reliable enough to be an acceptable means of determining whether the Vaccines were fit for use. Considering that Motkya offers no opinion on this question and appears to have no specialized expertise that would allow her to so opine, and that she did not perform any scientific analysis other than to review the studies cited by

Hem, the Court is not persuaded that Motkya's opinions on this issue would assist the trier of fact. Motkya's responses to Hem's critique of the "shake test" can just as easily be raised by counsel on cross-examination.

Merck's motion is denied in part and granted to the limited extent of precluding Motkya from testifying as to the scientific reliability of the "shake test."

H. *MERCK'S MOTION TO PRECLUDE TESTIMONY FROM HAROLD ZIEGLER CONCERNING THE TOPICS ADDRESSED IN SECTIONS IV.A, IV.B AND IV.D OF HIS REBUTTAL REPORT TO DR. HEM*

Merck makes essentially the same objections to the rebuttal report of Harold Ziegler ("Ziegler") as it made in its motion to preclude Motkya from testifying based on the opinions in her rebuttal report to Hem. Specifically, Merck argues that Ziegler, a physical chemist, is not qualified as an expert on vaccines and vaccine temperature testing methods and thus that his opinions on vaccine freezing points, supercooling and the reliability of sample testing based on microscopy should all be excluded.

■ Ziegler's opinion on vaccine freezing points is simply that different vaccines necessarily have different freezing points because they contain different quantities of a dissolved solute. Ziegler states that the freezing point of any solution is a direct function of the number of particles of solute dissolved in it. This is a general principle of physical chemistry on which Ziegler has sufficiently demonstrated that he is clearly knowledgeable.

■ Ziegler's opinions on supercooling, like Motkya's, are also admissible because, as discussed above, supercooling is a phenomenon generally applicable to liquids, which Ziegler, as a physical chemist, is entirely qualified to opine upon.

■ However, as with Motkya, Ziegler has not sufficiently shown that he is an expert on the effectiveness of sampling tests in determining a vaccine's potency. Thus, to the extent he opines that a microscopic examination is effective to test potency, he is arguably not qualified to opine on this topic. There is no indication that he has any experience testing vaccine potency, thus his opinion on this issue will not assist the trier of fact.

Merck's motion is denied in part and granted to the limited extent of precluding Ziegler from testifying on the reliability of microscopic examination in determining vaccine potency.

### ORDER

For the reasons discussed above, it is hereby

**ORDERED** that:

American Home's Motion In Limine Seeking Preclusion of Certain E–Mails and Instructional Handling Advices is denied;

American Home's Motion In Limine Seeking Preclusion of Prior Claim Handling and Prior Claims is denied;

American Home's Motion In Limine Seeking to Bifurcate Extra–Contractual Claims from Indemnity Claims for Claims 1–6 is denied;

American Home's Daubert Motion Seeking to Preclude the Testimony of Linda Walker is denied;

American Home's Daubert Motion Seeking to Preclude the Testimony of Alan Jervis is denied in part and granted in part to the extent that Alan Jervis is precluded from testifying regarding his opinion on the correct interpretation of the actual provisions in the Transit Policy;

American Home's Daubert Motion Seeking to Preclude the Testimony of Stanley Hem is denied;

American Home's Daubert Motion Seeking to Preclude the Testimony of Martha M. Bennet is denied;

American Home's Daubert Motion Seeking to Preclude the Testimony of Tom Bozzo is denied;

Merck's Motion In Limine to Exclude Evidence Relating to an FDA Inspection of Operations in Puerto Rico is denied;

Merck's Motion In Limine to Exclude Evidence of Vaccine Preservation is granted;

Merck's Motion In Limine to Restrict Use of Word VIOXX and Preclude Reference to Unrelated Litigation is granted;

Merck's Motion In Limine to Restrict Any Expert Testimony Regarding the FDA's Approval of Label Warnings is denied;

Merck's Motion In Limine to Exclude Evidence Relating to FDA Inspections and Reports of Operations in West Point, Pennsylvania is denied;

Merck's Motion In Limine to Exclude Allegations of Price–Fixing and Tax Improprieties is denied;

Merck's Motion In Limine to Exclude Evidence of Manufacturing Costs is denied;

Merck's Motion In Limine to Set the Order of Proof at Trial is denied;

Merck's Motion to Preclude Testimony of Harold I. Ziegler concerning certain topics is denied in part and granted in part to the limited extent of precluding Harold Ziegler from testifying on the reliability of microscopic examination in determining vaccine potency;

Merck's Motion to Preclude Testimony of Linda Motkya concerning certain topics is denied in part and granted in part to the limited extent of precluding Linda Motkya from testifying on the reliability of the "shake test";

Merck's Motion In Limine to Preclude Testimony and Strike the Report of Dr. Patrick Brecht is denied.

**SO ORDERED.**