# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TORRENT PHARMA, INC., | ) | |
| QBE UNDERWRITERS LTD., | ) | |
| LIBERTY CORPORATE CAPITAL | ) | |
| LTD., HAMILTON MANAGEMENT | ) | |
| AGENCY LTD., RIVERSTONE | ) | |
| MANAGING AGENCY LTD., BRIT | ) | |
| SYNDICATES LTD., and ARGO | ) | |
| MANAGING AGENCY LTD., | ) | C.A. No. N18C-05-094 CEB |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PRIORITY HEALTHCARE | ) | |
| DISTRIBUTION, INC., d/b/a | ) | |
| CURASCRIPT SD SPECIALTY | ) | |
| DISTRIBUTION, and DENALI OHIO | ) | |
| SOUTHPARK INDUSTRIAL LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: June 10, 2022
Decided: August 11, 2022

*Upon Consideration of Plaintiffs' Motion for Summary Judgment*,
**GRANTED IN PART and DENIED IN PART**.

*Upon Consideration of Defendant Priority Healthcare Distribution, Inc.'s Motion
for Summary Judgment Against Plaintiffs*,
**GRANTED IN PART and DENIED IN PART**.

*Upon Consideration of Defendant Priority Healthcare Distribution, Inc.'s Motion for Summary Judgment Against Defendant Denali Ohio Southpark Industrial LLC*,
**DENIED**.

*Upon Consideration of Defendant Priority Healthcare Distribution, Inc.'s Motion in Limine*,
**DENIED**.

*Upon Consideration of Defendant Denali Ohio Southpark Industrial LLC's Motion for Summary Judgment On the Issue of Causation*,
**GRANTED IN PART and DENIED IN PART**.

*Upon Consideration of Defendant Denali Ohio Southpark Industrial LLC's Motion for Summary Judgment On the Issue of Damages*,
**DENIED**.

## MEMORANDUM OPINION

Michael B. McCauley, Esquire, PALMER BIEZUP & HENDERSON LLP, Wilmington, Delaware; Kevin G. O'Donovan, Esquire, PALMER BIEZUP & HENDERSON LLP, Philadelphia, Pennsylvania. *Attorneys for Plaintiffs*.

Elizabeth A. Sloan, Esquire, and Brittany M. Giusini, Esquire, BALLARD SPAHR LLP, Wilmington, Delaware; Matthew D. Knepper, Esquire, and Tanya M. Maerz, Esquire, HUSCH BLACKWELL LLP, St. Louis, Missouri. *Attorneys for Defendant Priority Healthcare Distribution, Inc*.

Sarah B. Cole, Esquire, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, P.C., Wilmington, Delaware. *Attorney for Defendant Denali Ohio Southpark Industrial LLC*.

**BUTLER, R.J.**

Plaintiff Torrent Pharma, Inc. is an India-based pharmaceutical manufacturer that entered a product distribution contract with Defendant Priority Healthcare Distribution, Inc. ("CuraScript"). CuraScript agreed to manage Torrent's prescription drug products at a warehouse in Ohio (the "Warehouse"). CuraScript leased the Warehouse from Defendant Denali Ohio Southpark Industrial LLC. This litigation concerns the fallout from a leaking Warehouse pipe.

A few years ago, one of the Warehouse's overhead sprinklers leaked water onto 19 pallets of Torrent's products. The leaks allegedly caused over $200,000 in damage. Torrent and its insurers (collectively, "Underwriters") have brought this tort and contract action against the Defendants to recover their losses. The Defendants, in turn, have asserted indemnification crossclaims for full coverage of any award the Plaintiffs receive.

The parties now move for summary judgment.[1] After culling a herd of issues, the Court concludes that the Defendants are entitled to summary judgment as to the Plaintiffs' tort and third-party beneficiary claims and the Plaintiffs are entitled to summary judgment as to CuraScript's contractual liability. No party is entitled to summary judgment as to the Plaintiffs' damages. And neither Defendant is entitled

---

[1] CuraScript also has moved *in limine*. The motion is based on the same arguments CuraScript makes in support of summary judgment. Accordingly, it is resolved— and denied—consistent with this decision. *See infra* Analysis § C.

to summary judgment as to its indemnification crossclaim. The parties' motions are granted and denied accordingly.

## BACKGROUND[2]

### A. The Agreements

The parties' arrangements are expressed through two separate agreements. Torrent and CuraScript executed a services contract (the "Logistics Agreement")[3] that operated at the Warehouse. CuraScript rented the Warehouse under a lease (the "Lease")[4] that CuraScript's corporate predecessor entered with the Warehouse's previous owner. Denali assumed the Lease when it acquired the Warehouse. Denali is not a party to the Logistics Agreement and Torrent is not a party to the Lease.

Each agreement contains several terms that govern the issues in this case.

#### 1. The Logistics Agreement

Under the Logistics Agreement, CuraScript agreed to "store, handle, and transport" Torrent's products.[5] CuraScript's duties are measured by three provisions set out in the Logistics Agreement. The Logistics Agreement required CuraScript to render its services consistent with (i) a dozen "Key Performance Indicators"

---

[2] The Court draws the relevant facts from the exhibits attached to the parties' motions. The Court has construed the record in the light most favorable to each non-movant. *See infra* Standard of Review.

[3] Ex. A to D.I. 101 (Third-Party Logistics Agreement) [hereinafter "LA"].

[4] Ex. 1 to D.I. 97 (Lease Agreement) [hereinafter "Lease"].

[5] LA § 2.1.

("KPI");[6] (ii) rules promulgated by the United States Food and Drug Administration

("FDA");[7] and (iii) responsibilities listed in the "Operating Guidelines."[8]

### a. KPI #9

The KPI are bilaterally negotiated performance standards incorporated in the

Logistics Agreement that use task-specific metrics to determine whether the parties

are meeting each other's expectations.  One of them—KPI #9—is relevant here.

KPI #9 is directed to product damage.[9]  It imposes liability for "any [product

damage] claim arising out of . . . poor handling while on CuraScript's premises."[10]

In contrast to other provisions in the Logistics Agreement, KPI #9 is not tied to a

standard of care.[11]

The parties were contractually required to carry insurance coverage to

mitigate any liability for product damage.  KPI #9 requires the parties to carry

insurance at a policy cap greater than the products' "total value" or "replacement

cost."[12]  But the Logistics Agreement does not contain language barring an insurer

from bringing a subrogation claim to recoup its payments for covered losses.

---

[6] *Id.* § 2.5 (incorporating Ex. D to *id.* [hereinafter "KPI[#]"]).
[7] *Id.* § 8.
[8] *Id.* § 3.2 (incorporating Ex. A to *id.* [hereinafter "Operating Guidelines"]).
[9] *Id.* § 2.1, 2.5; KPI #9.
[10] KPI #9.
[11] *See, e.g.*, LA § 3.2 (articulating a "gross negligence or willful misconduct" standard); LA § 13 (articulating a "negligence" standard).
[12] KPI #9.

### b. Reg 211.208

The field of FDA regulation is vast. Unhelpfully, the Logistics Agreement generally references FDA's regulations, but does not identify any particular rule that CuraScript must obey. The parties, however, agree that FDA's "drug product salvaging" rule ("Reg 211.208") is the applicable rule.[13] So the Court starts there.

Reg 211.208 is part of FDA's "good manufacturing practices" or "GMP."[14] It regulates the sale of "drug products" that have been "subjected to improper storage conditions."[15] Improper storage conditions are defined to include "extreme" exposures to chemical and environmental forces caused by "equipment failures."[16]

Under Reg 211.208, improperly stored drug products must be discarded.[17] This mandate is consistent with GMP. FDA regulations provide that any "failure to comply with" GMP "in the manufacture, processing, packing, or holding of a drug shall render such drug . . . adulterated[.]"[18] In other words, a drug product that

---

[13] Drug Product Salvaging, 21 C.F.R. § 211.208 (2016).
[14] *See* 21 C.F.R. § 211.1(a) (2015).
[15] *Id.* § 211.208.
[16] *Id.*
[17] *Id.*
[18] *Id*. § 210.1(b) (2009).

violates GMP "is presumed adulterated."[19]  FDA may sue drug makers who sell improperly stored drug products.[20]

Reg 211.208 does give drug makers an option to "salvage" their improperly stored products.  Before salvaging improperly stored products, however, the manufacturer must first subject the products to scientific testing.  Under Reg 211.208, "salvaging operations *may* be conducted only if" there is evidence

> [i] from laboratory tests and assays . . . that the drug products meet all applicable standards of identity, strength, quality, and purity[;] and [ii] from inspection of the premises that the drug products and their associated packaging were not subjected to improper storage conditions as a result of the disaster or accident.[21]

### c. The Operating Guidelines

Finally, CuraScript also must follow the Operating Guidelines.  The Operating Guidelines are incorporated into the Logistics Agreement and allocate a list of product management functions to CuraScript.  For example, the Operating Guidelines designate CuraScript as the party "responsible" for all "physical inventory," including "packing" and "putting away" Torrent's products.[22]

---

[19] Patricia I. Carter, *Federal Regulations of Pharmaceuticals in the United States and Canada*, 21 Loy. L.A. Int'l & Compar. L.J. 215, 239 (1999) (citing 21 C.F.R. § 210.1(b)).  *See also United States v. Richlyn Labs., Inc.*, 827 F. Supp. 1145, 1150–51 (E.D. Pa. 1992).
[20] *See* 21 C.F.R. § 210.1(b); *see also* Food, Drug, and Cosmetic Act, 21 U.S.C § 331(c) (2018) (prohibiting introduction of "adulterated" drugs into the market).
[21] 21 C.F.R. § 211.208 (emphasis added).
[22] Operating Guidelines.

CuraScript is liable for "Loss," including for "product damage,"[23] that results from a failure to follow the Operating Guidelines.[24]

## 2. The Lease

The Lease governs CuraScript and Denali's landlord-tenant relationship. Relevant here, the Lease imposes on the Defendants maintenance duties and accords them qualified indemnification rights.

### a. The Maintenance Provision

Under Lease Section 5 (the "Maintenance Provision"), the Defendants divided the duties to maintain the Warehouse's "mechanical systems."[25]   Under the Maintenance Provision, CuraScript must "repair" all mechanical systems and Denali must "replace" all mechanical systems:

> [CuraScript's] maintenance obligation . . . include[s] the repair (but not the replacement) of all . . . mechanical systems located within the [Warehouse] . . . .  [Denali] will . . . be responsible for replacing (but not repairing) all . . . mechanical systems located within the [Warehouse] . . . .[26]

The Defendants agree that the Warehouse's sprinklers qualify as mechanical systems.  The Lease, however, does not define "repair" or "replace" or specify the circumstances under which a sprinkler would need to be repaired or replaced.  It also

---

[23] LA § 15.
[24] *Id.* § 3.2.
[25] Lease § 5.
[26] *Id.*

does not define the level of repair or replacement that must be achieved before maintenance may be deemed adequate.

Moreover, Denali's replacement duties contain a caveat. The Maintenance Provision declares that Denali is not required to replace a mechanical system that needs replacement "due to the fault or negligence of [CuraScript] or its agents[.]"[27]

### b. The Hold Harmless Provision

Under Lease Section 15 (the "Hold Harmless Provision"), the Defendants enjoy a mutual right to indemnification "from any liability . . . associated with any damage . . . to any . . . property" that was caused at the Warehouse. CuraScript agreed to indemnify Denali for property damage that "arises directly from [CuraScript's] . . . acts or omissions in connection with [its] use or occupancy of" the Warehouse.[28] Denali agreed to indemnify CuraScript for property damage "occasioned by [Denali's] fault or negligence."[29]

## B. The Sprinklers

The Warehouse contains overhead sprinklers. The sprinklers are structurally integrated with a fire suppression system that the Warehouse shares with a nearby facility. The system feeds water from a municipal well to the Warehouse's sprinklers through a pump. The pump is located inside the nearby facility.

---

[27] *Id.*
[28] *Id.* § 15.
[29] *Id.*

Denali owns the facility housing the water pump, but CuraScript does not have access to it. Accordingly, any work on the Warehouse's sprinklers that involves detaching the pipes would require CuraScript to enter property it does not own to close the main valve.

## C. The Problems with Riser 6

Denali purchased the Warehouse in January 2016. One of the Warehouse's sprinklers, "Riser 6," started leaking two months later. CuraScript had been storing some of Torrent's products underneath Riser 6.

CuraScript told Denali about the leaks. After each leak, Denali would send a contractor to patch or otherwise reinforce the pipes. Denali also replaced some, but not all, of Riser 6's piping. Either way, Denali's solutions did not work. Even with bandaging and partial replacements, Riser 6 leaked about eight to ten times.

As early as March 2016, CuraScript began demanding that Denali replace Riser 6 entirely. Denali, however, did not think a full replacement was necessary.[30] The real problem, in Denali's view, was not the pipes themselves, but rather the potential presence of corrosive contaminants in the water.[31] Despite Denali's position, CuraScript continued to call for Riser 6's replacement. Indeed, CuraScript warned that a failure to fully replace Riser 6 could cause serious damage one day.[32]

---

[30] Ex. L to D.I. 101 at 3 (E-mails) (Denali states that Riser 6 is "fine" as is).
[31] *Id.* at 4 (E-mails).
[32] Ex. 8 to D.I. 97 at 3 (E-mails).

10

## D. The May Leak

That fear came true. On May 9, 2016, CuraScript reported another leak (the "May Leak"). The May Leak happened overnight, *i.e.*, when CuraScript personnel were not there to intervene. Consequently, more of Torrent's products were damaged than ever had been previously.[33]

CuraScript sent photos of the damage to Torrent. The photos depicted exterior water damage to the products' packaging. Based on CuraScript's photos, Torrent concluded that 19 pallets of its prescription drugs were "unsalvageable" within the meaning of Reg 211.208. Torrent did not conduct any further investigation into whether the water penetrated the packaging or soaked or physically altered the pills inside the boxes. Instead, Torrent directed CuraScript to discard them all.

Having reviewed its "purchase register," Torrent determined that the damaged products were worth at least $215,110.[34] Underwriters fully covered the loss after Torrent paid a $50,000 deductible.

After the May Leak, CuraScript reasserted its demand that Denali replace Riser 6 entirely. In response, Denali retained an inspector to diagnose the pipes. At the time, Riser 6 was long overdue for an inspection. The inspector's analysis revealed that the pipes were irreparably deteriorated. Additional consultants opined

---

[33] Riser 6's leaks previously caused $20,000 in damage to Torrent's products. CuraScript paid Torrent for that damage.
[34] *See* Exs. N & O to D.I. 101 (Dep. & Spreadsheet).

that the erosion likely was caused by age and wear-and-tear. Denali acknowledged that this explanation effectively debunked its contaminated pipes theory.[35]

Denali replaced Riser 6 in August 2016. No leaks were reported ever again.

## E. This Litigation

The Plaintiffs[36] have sued the Defendants alleging torts and breaches of contract based on the damage to Torrent's products. Their complaint brings three counts: (i) breach of a "bailment" against both Defendants ("Count I"); (ii) breach of the Logistics Agreement against CuraScript ("Count II"); and (iii) breach of the Lease against Denali ("Count III").[37] The Plaintiffs seek $265,110 in damages,

---

[35] Ex. 11 to D.I. 97 (E-mail).

[36] Initially, Torrent did not name Underwriters as co-plaintiffs. Nor was there any suggestion that Underwriters were subrogating in Torrent's name. And none of the parties' motions mentioned that Torrent received insurance coverage for its claims. All this led to several months of letter briefing on Torrent's right to recover double damages as a compensated insured. D.I. 125, 127–28, 132–35. It turned out that Delaware law permits a "partially compensated insured," like Torrent, to seek a deficiency judgment from the wrongdoer. *See generally Catalfano v. Higgins*, 188 A.2d 357, 358–59 (Del. 1962).

Still, Torrent sought the entire loss—*i.e.*, $265,110, not just the $50,000 deductible. Torrent explained that it could do this because it had an undisclosed agreement with Underwriters to disgorge any award above $50,000. Given no good reason to accept that representation, the Court ordered Torrent either to name Underwriters as plaintiffs or docket an affidavit of ratification from them. D.I. 136 ¶ 9 (Order); *see generally* Del. Super. Ct. Civ. R. 17(a). Torrent chose to name Underwriters. Underwriters then joined Torrent's summary judgment motion and its oppositions. At a post-joinder hearing, the Defendants insisted that their summary judgment motions applied equally against Underwriters. Accordingly, the parties' motions will be decided as originally submitted.

[37] D.I. 137 ¶¶ 20–31 (Pls.' Am. Compl.).

which allegedly represents the products' "total value" or "replacement cost."[38]  The Defendants have denied liability, raised defenses, and asserted indemnification crossclaims based on the Hold Harmless and Maintenance Provisions.

While discovery was ongoing, the Defendants filed dispositive motions to resolve their crossclaims.  The Court denied the motions.[39]  Discovery proceeded and then culminated in these five summary judgment motions.  All the motions are opposed.  The motions are now ripe for decision.

## STANDARD OF REVIEW

The Court will grant summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[40]  In considering a motion for summary judgment, the Court construes the record in the light most favorable to the non-movant.[41]  The movant bears the initial burden of demonstrating "clearly the absence of any genuine issue of fact."[42]  If that burden is met, then the non-movant must offer "some evidence" of a material factual issue.[43]  "If the facts permit reasonable persons to draw but one inference, the question is ripe

---

[38] *See* KPI #9; D.I. 137 ¶¶ 22, 26, 31.
[39] *See generally Torrent Pharma, Inc. v. Priority Healthcare Distrib., Inc.*, 2020 WL 6066275 (Del. Super. Ct. Oct. 15, 2020).
[40] Del. Super. Ct. Civ. R. 56(c).
[41] *E.g.*, *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992).
[42] *Brown v. Ocean Drilling & Expl. Co.*, 403 A.2d 1114, 1115 (Del. 1979).
[43] *Phillips v. Del. Power & Light Co.*, 216 A.2d 281, 285 (Del. 1966).

for summary judgment."[44]  Conversely, summary judgment is inappropriate "if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom."[45]

On summary judgment, the Court "cannot try issues of fact . . . but only is empowered to determine whether there are issues to be tried."[46]  "[T]he function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems . . . to have the greater weight."[47]  "The test is not whether the judge considering summary judgment is skeptical that [the non-movant] will ultimately prevail."[48]

"There is no 'right' to a summary judgment."[49]  The Court may, in its discretion, deny summary judgment if it determines further factual development would clarify the law or its application.[50]  Summary judgment also may be denied "even if its technical requirements seem to be met" if the Court finds "a trial record is necessary in the interests of justice."[51]

---

[44] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

[45] *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970).

[46] *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (internal quotation marks omitted).

[47] *Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969).

[48] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002).

[49] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

[50] *E.g., Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918–19 (Del. 1965); *Ebersole v. Lowengrub*, 180 A.2d 467, 468–69 (Del. 1962).

[51] *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1024 (Del. Super. Ct. 2021) (internal quotation marks omitted).

"[C]ross-motions for summary judgment are not the procedural equivalent of a stipulation for a decision on a 'paper record.'"[52] As a result, the mere presence of cross-motions for summary judgment "does not act *per se* as a concession" that there are no material facts in dispute.[53] Civil Rule 56 permits the Court to deem cross motions for summary judgment "to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions" only if the parties "have not presented argument" on the existence of a material factual issue.[54] In this case, the parties have presented such argument. So the Court must evaluate each motion independently to determine whether factual issues exist.[55]

## ANALYSIS

### A.  The Defendants are entitled to summary judgment as to Counts I & III.

The parties have cross-moved for summary judgment as to Counts I & III. As explained below, Counts I & III fail as a matter of law and undisputed fact because Torrent (1) cannot bring tort claims against CuraScript; (2) did not enter a bailment with Denali; and (3) is not an intended beneficiary of the Lease. Accordingly, as to

---

[52] *Empire of Am. Relocation Servs., Inc. v. Com. Credit Co.*, 551 A.2d 433, 435 (Del. 1988).
[53] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).
[54] Del. Super. Ct. Civ. R. 56(h).
[55] *E.g.*, *Cont'l Airlines Corp. v. Am. Gen. Corp.*, 575 A.2d 1160, 1164 n.5 (Del. 1990); *accord Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 n.9 (Del. 1997).

Counts I & III, the Defendants' summary judgment motions are granted and the Plaintiffs' summary judgment motion is denied.

**1. Torrent cannot bring tort claims against CuraScript.**

Count I alleges that CuraScript "negligently" breached a "bailment" by accepting Torrent's products and then returning them in damaged condition. Negligent breach of bailment is a tort claim.[56]  A tort claim must be dismissed if it is based on the same duty asserted in a breach of contract claim.[57]  Here, the Plaintiffs concede that they have not stated a duty independent of the obligations imposed on CuraScript by the Logistics Agreement.[58]  Accordingly, Count I fails as a matter of law as to CuraScript.

**2.  Torrent and Denali did not enter a bailment.**

Count I also asserts a negligent bailment claim against Denali.  According to the Plaintiffs, Denali became a bailee when Torrent's products arrived at the Warehouse.   This argument fails because Torrent delivered its products to CuraScript, not Denali.

---

[56] *See Lee Tire & Rubber Co. v. Dormer*, 108 A.2d 168, 172 (Del. 1953); *see also Devincentis v. Eur. Performance, Inc.*, 2012 WL 1646347, at *4 (Del. Super. Ct. Apr. 17, 2012); *see generally* 8A Am. Jur. 2d *Bailments* §§ 206–07, Westlaw (2d ed. database) (last updated May 2022).
[57] *E.g.*, *Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 2106945, at *8–9 (Del. Super. Ct. June 6, 2012); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009).
[58] D.I. 111 at 2.

"A bailment arises when one party delivers property to another for some purpose after which the property will be returned to the original party."[59] "In other words, an essential element of a bailment is that the property be taken into the possession of the bailee[] or that custody of the property be entrusted to her."[60] Accordingly, "Delaware law requires either an express or implied contract before a bailment will be found."[61]

Torrent did not deliver its products to Denali with the expectation that Denali would return them. To the contrary, Torrent delivered its products to *CuraScript* with the expectation that they would be shipped to buyers.[62] The mere fact that Denali owned the Warehouse does not mean Denali was responsible for Torrent's products. Finding otherwise would make commercial landlords bailees of whatever items end up inside their properties. That is neither a logical policy nor supported by anything in the Plaintiffs' motion.

---

[59] *Golt by Golt v. Sports Complex, Inc.*, 644 A.2d 989, 992 (Del. Super. Ct. 1994).

[60] 8 C.J.S. *Bailments* § 20, Westlaw (May 2022 ed.) (citations omitted). *See Beattie v. Beattie*, 786 A.2d 549, 555 (Del. Super. Ct. 2001) ("[A] bailment occurs only if both possession and control of the property are transferred to the bailee." (emphasis omitted)); *see also In re Wechsler*, 121 F. Supp. 2d 404, 437 (D. Del. 2000) (identifying voluntary acceptance as an element of a bailment).

[61] *Manchester Equip. Co., Inc. v. Am. Way Moving & Storage, Inc.*, 176 F. Supp. 2d 239, 245–46 (D. Del. 2001).

[62] *See* LA § 2.1 ("CuraScript shall . . . receive, warehouse, and . . . ship [p]roducts from the facilities . . . ." (cross-references and enumeration omitted)).

17

Torrent contracted with CuraScript, not Denali. So the Logistics Agreement, if anything, supplies Torrent with remedies for product damage. The Plaintiffs cannot use free-floating tort claims to secure more contractual protections than Torrent bargained for. Accordingly, Count I fails as to Denali.

### 3. Torrent is not a third-party beneficiary of the Lease.

Unable to sue Denali under the Logistics Agreement, the Plaintiffs invoke the Lease. But Torrent is not a party to the Lease. So Count III asserts a "third-party beneficiary" claim.

The Plaintiffs contend that they are entitled to enforce the Maintenance Provision of the Lease against Denali because of its alleged failure to replace the sprinklers caused damage to Torrent's products. The Plaintiffs thus reason that the mere act of shipping products to a tenant makes the shipper a tenant too. Unsound as an idea, Count III also fails as a matter of law. The Defendants did not intend for Torrent to benefit from the Lease.

In general, only parties to a contract may enforce that contract.[63] An exception exists for non-parties who benefit from someone else's contract. But not all beneficiaries have enforcement rights. Only "intended beneficiaries" do.[64]

---

[63] E.g., *Triple C Railcar Serv., Inc. v. City of Wilmington*, 630 A.2d 629, 633 (Del. 1993).

[64] See, e.g., *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1213 (Del. 2021); *Envolve Pharm. Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, 2021 WL 140919, at *10 (Del. Super. Ct. Jan. 15, 2021).

18

To create an intended beneficiary, the contracting parties must intend to benefit the non-party and their intent to benefit the non-party "must be a material part of [their] purpose in entering the contract."[65] Conversely, a non-party who "happens to benefit from . . . a contract either coincidentally or indirectly" is an incidental beneficiary.[66] Unlike intended beneficiaries, "incidental beneficiaries have no legally enforceable rights under a contract."[67]

Torrent is not an intended beneficiary of the Lease. The material purpose of the Maintenance Provision is to keep the Warehouse in good repair. Proper maintenance promotes the point of the Lease. CuraScript is a distributor whose business depends on undamaged freight. Denali is a landlord whose business depends on tenants. Keeping the Warehouse in good repair thus would both protect CuraScript from liability for damaged cargo and ensure current and future rents for Denali. In performing the Maintenance Provision, the Defendants intended to benefit themselves, not Torrent.

True, Torrent benefits from Denali's maintenance too. Working pipes do not leak. But those trickle-down benefits are incidental. They flow indirectly from the repairs the Defendants intended for their own business models. Plus, the Lease was

---

[65] *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

[66] *Insituform of N. Am., Inc. v. Chandler*, 534 A.2d 257, 269 (Del. Ch. 1987).

[67] *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007).

drafted before Torrent contracted with CuraScript. Indeed, the Lease existed even before CuraScript and Denali did. The Maintenance Provision therefore could not have been drafted with Torrent in mind. Accordingly, Torrent is an incidental beneficiary and so the Plaintiffs are not entitled to enforce the Lease against Denali.

The Plaintiffs, however, are entitled to enforce the Logistics Agreement against CuraScript. Torrent contracted with CuraScript to obtain the very type of remedies it seeks from Denali. And as explained below, that recourse attaches regardless of who caused the loss. So Denali's negligence, if any, is CuraScript's problem, not Torrent's problem. Count III fails as a matter of law.

**B. The Plaintiffs are entitled to summary judgment as to Count II's liability element.**

The Court now turns to the Plaintiffs' principal theory: Count II. Count II alleges a breach of contract claim against CuraScript. To state a breach of contract claim, the Plaintiffs must allege (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damage.[68] Determining whether CuraScript breached the Logistics Agreement involves contract interpretation. Although the parties give

---

[68] *E.g.*, *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

20

little attention to the contractual language,[69] the proper construction of a contract is a question of law that the Court must decide on its own.[70]

The principles of contract interpretation are well-established and grounded on the parties' objective intent at the time of contracting as expressed by the plain language contained within their agreement's four corners.[71] The Court construes a contract as a whole, giving purpose to each provision.[72] And the Court accords a contract's "clear and unambiguous terms . . . their ordinary meaning."[73] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[74]

"Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it."[75] Ambiguity exists only if a contract term "is fairly or reasonably susceptible of more than one meaning."[76] So a contract

---

[69] The Plaintiffs consider CuraScript's liability self-evident, D.I. 101 at 12–13, and CuraScript focuses solely on the question of damages, D.I. 99 at 6–13.

[70] *E.g.*, *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017); *see also Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 n.68 (Del. 2019).

[71] *E.g.*, *Fletcher v. Feutz*, 246 A.3d 540, 555 (Del. 2021).

[72] *E.g.*, *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[73] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).

[74] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[75] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[76] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

term "is not ambiguous simply because the parties disagree on its meaning."[77] "Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written."[78] "It is not the court's role to rewrite the contract . . . [or] allocat[e] the risk of an agreement after the fact . . . ."[79]

To obtain summary judgment, the movant's contract interpretation must be the only reasonable one.[80] A contract interpretation is reasonable when the contract is "read in full and situated in the commercial context between the parties."[81] Even so, "background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[82] "[I]t is not the job of a court to relieve . . . parties of the burdens of contracts they wish they had drafted differently but in fact did not."[83]

"Summary judgment is an effective tool to resolve unambiguous contracts because there is no need to resolve material disputes of fact."[84] As explained below,

---

[77] *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).

[78] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

[79] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624 (Del. Ch. 2005), *rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006).

[80] *E.g.*, *GMG Cap.*, 36 A.3d at 783–84.

[81] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017); *accord OptiNose AS v. Currax Pharms., LLC*, 264 A.3d 629, 638 (Del. 2021).

[82] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018).

[83] *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

[84] *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 4130631, at *10 (Del. Super. Ct. Sept. 10, 2021) (internal quotation marks omitted).

the Logistics Agreement is not ambiguous.  Under the Logistics Agreement's plain

language, CuraScript is liable for the damage to Torrent's products.

**1. CuraScript is liable for "any" product damage "arising out of" "poor handling" at the Warehouse, not just product damage it personally causes and even if Denali ultimately is found responsible for the damage.**

The Plaintiffs contend that CuraScript breached the Logistics Agreement by

mishandling Torrent's products.  Under the Logistics Agreement, CuraScript must

"store, *handle*, and transport" Torrent's products.[85]  CuraScript's handling duties are

repeated in KPI #9—an obligation to which CuraScript also agreed to be bound.[86]

Under KPI #9, CuraScript is liable for "*any* [product damage] claim *arising out of .* 

*. . poor handling* while on CuraScript's premises[,]" *i.e.*, the Warehouse.[87]

This language is unconditional.  Unlike neighboring provisions, KPI #9 is not

qualified by a standard of care.[88]  Where one contract section omits a term present

in another, the omission is presumed intentional.[89]  Moreover, KPI #9 applies to

---

[85] LA § 9.3 (emphasis added).
[86] *Id.* § 2.5.
[87] KPI #9 (emphases added).
[88] *See, e.g.*, LA § 3.2 ("gross negligence or willful misconduct"); LA § 13 ("negligence or misconduct").
[89] *See, e.g.*, *McDonald's Corp. v. Easterbrook*, 2021 WL 351967, at *5 (Del. Ch. Feb. 2, 2021).  *See also Fortis Advisors LLC v. Shire US Holdings, Inc.*, 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017) (analogizing counterparties' omission of specific terms to the statutory canon of *expresio unius est exclusio alterius,* which provides that an omission presumptively is intentional when other terms are included instead); *cf. NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word

23

"any" claim. So it does not depend on a specific wrongdoer or type of wrongdoing. Given the breadth of KPI #9, and the absence of a negligence or analogous standard of care, the parties plainly intended that CuraScript be strictly liable for product damage sustained inside the Warehouse.

Although strict liability may seem extreme, the parties accepted it. The Logistics Agreement—and KPI #9 itself—is replete with mandatory insurance provisions. CuraScript thus offloaded the risk of product damage, making insurers—not CuraScript—the targets of this unqualified liability. As observed, however, CuraScript did not secure a subrogation waiver. Nevertheless, contracts executed by sophisticated counterparties must be enforced as written.[90]

To be sure, the Logistics Agreement does not make strict liability automatic. Under KPI #9, strict liability attaches only if product damage "arises out of" "poor handling." The Logistics Agreement does not define "arising out of" or "handling," but dictionaries do. And "[u]nder well-settled law," the Court may use the dictionary to ascertain the meaning of undefined contract terms.[91]

---

should be given meaning and effect by the court."), *aff'd*, 2008 WL 571543 (Del. Mar. 4, 2008).

[90] *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 2009 WL 4154356 (Del. Nov. 24, 2009).

[91] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

Dictionaries define "arise" as "to originate; to stem (from)" and "to result (from)."[92]  Delaware courts also have "approved a number of synonyms" for arise, including "originating from, having its origin in, growing out of, and flowing from."[93]  In short, arising language embodies a loose conception of causation.[94]

"Handle" has many definitions, but its most natural meaning for supply chain parties would relate to product management.[95]  Contextualized, "handle" means "to engage in the . . . distributing of (a commodity),"[96] "especially the packaging and shipping of an object or a material[.]"[97]  Similarly, "handle" also means "to deal with . . . goods that pass through . . . [a] port or other center[.]"[98]  The logistics industry

---

[92] *Arise*, *Black's Law Dictionary* (11th ed. 2019).

[93] *Sycamore*, 2021 WL 4130631, at *12 (internal quotation marks omitted).

[94] *See Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1257 (Del. 2008).

[95] *See, e.g.*, *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *33 (Del. Super. Ct. July 29, 2021) (selecting among competing definitions using a context-specific approach); *see also E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 59 (Del. Super. Ct. 1995) ("If the mere existence of different dictionary definitions constitutes an ambiguity, drafting unambiguous contractual language would be impossible without defining almost every word.  Standing alone, multiple dictionary definitions do not prove all differing definitions are reasonable." (citation omitted)).

[96] *Handle*, *Merriam-Webster* (online ed.), https://www.merriam-webster.com/dictionary/handle (last visited July 29, 2022).

[97] *Handling*, in *id.*, https://www.merriam-webster.com/dictionary/handling (last visited July 29, 2022).

[98] *Handle*, *Macmillan* (online ed.), https://www.macmillandictionary.com/us/dictionary/american/handle_1 (last visited July 29, 2022).

25

defines handling in these ways too.[99] And when a contract term "has no 'gloss' in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning."[100]

The Logistics Agreement's Operating Guidelines support adoption of the dictionary definitions of handling. The Operating Guidelines, in turn, illumine CuraScript's KPI #9 duties.

Under the Operating Guidelines, CuraScript is the party "responsible" for all "physical inventory."[101] That includes "packing" and "putting away" the inventory.[102] And, like KPI #9, the Operating Guidelines do not depend on a standard of care. As a consequence, CuraScript is liable for damage to Torrent's inventory regardless of CuraScript's diligence in attempting to prevent it.[103]

Read as a whole, the Logistics Agreement supports only one reasonable interpretation of KPI #9. Under KPI #9, "poor handling" is any failure by CuraScript

---

[99] *See generally, e.g.*, *What is Material Handling?*, REB Storage Sys. Int'l, https://rebstorage.com/articles-white-papers/what-is-material-handling/ (last visited July 29, 2022); *Material Handling*, MHI, https://www.mhi.org/fundamentals/material-handling (last visited July 29, 2022).

[100] *USA Cable v. World Wrestling Fed'n Ent., Inc.*, 766 A.2d 462, 474 (Del. 2000).

[101] Operating Guidelines.

[102] *Id.*

[103] *See* LA § 3.2 (requiring Torrent to submit Loss caused by CuraScript's gross negligence or willful misconduct to insurance unless the Loss derives from CuraScript's failure to follow the Operating Guidelines).

to protect Torrent's products from damage stemming from or originating in the distribution process even if CuraScript is not the underlying cause of the damage.

The parties' basic commercial context confirms this interpretation. Torrent is based overseas. It shipped its products to CuraScript—no one else. From Torrent's perspective, then, CuraScript is the only party positioned to protect Torrent's products. By the same token, CuraScript is the only party who reasonably could be expected to cover any damage.

In all this, it would not make sense, as CuraScript suggests, for a foreign manufacturer to pursue tortfeasors to recover the value of its saturated products when its domestic contract party is the one who was supposed to keep those products dry. By putting its products in CuraScript's hands, Torrent reasonably expected CuraScript to ensure that the products would not be poorly handled. They were.

**2. Torrent's product damage arose from "poor handling" at the Warehouse.**

CuraScript agreed to handle Torrent's products. It put some of those products underneath Riser 6. Then Riser 6 leaked on them. CuraScript took photos of the damage, dispelling any doubt that some damage occurred.

The only reasonable inference to draw from these facts is that Torrent's products were damaged by events stemming from CuraScript's decision to place Torrent's products underneath a leaking sprinkler. It does not matter if the sprinkler leaked because of Denali or something or someone else. As far as KPI #9 is

27

concerned, CuraScript's decision to situate the products underneath Riser 6—which had leaked many times before May—was poor handling "on CuraScript's premises." Accordingly, CuraScript will be liable for the product damage unless the Plaintiffs fail to prove damages.

### 3. CuraScript's contrary arguments do not support summary judgment.

CuraScript breached the Logistics Agreement. CuraScript tries to muddy this conclusion with three unsuccessful arguments.

CuraScript first argues that the parties agreed to resolve product damage claims exclusively through insurance. This interpretation is not reasonable. The parties did not include any anti-subrogation language in the Logistics Agreement.[104] So the Plaintiffs did not waive their right to pursue CuraScript directly.[105] Had CuraScript wanted to bar subrogation claims, it could have said so. It did not. CuraScript cannot assert insurance as an exclusive remedy in court when it did not negotiate insurance as an exclusive remedy in the first place.[106]

---

[104] *See generally* 16 Couch on Insurance § 224:1, Westlaw (3d ed. database) (last updated June 2022) (providing background on waivers of subrogation).

[105] *Cf. Del. Ins. Coverage Off. v. DiSabatino Constr. Co.*, 2022 WL 811167, at *4–8 (Del. Super. Ct. Mar. 17, 2022) (enforcing anti-subrogation clause against insurance parties); *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, 2003 WL 139775, at *4–5 (Del. Super. Ct. Jan. 15, 2003) (same).

[106] *See Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 675 (Del. 2020) (The Court must "interpret . . . contracts as written and not as hoped for by litigation-driven arguments."); *see also Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("Parties have a right to enter into good and bad contracts, the law enforces both.").

CuraScript next argues that *it* cannot be liable because (it believes) *Denali* caused the product damage. CuraScript thus seeks to cabin KPI #9's reach only to damage that CuraScript personally inflicts. But this position is contradicted by the Logistics Agreement. As explained, KPI #9 is indifferent to who caused the product damage. The May Leak very well may be Denali's fault as a matter of the *Lease*. But that does not mean CuraScript is faultless as matter of the *Logistics Agreement*. CuraScript cannot wield the Lease both as a shield from Denali and as a sword against Torrent.[107]

Finally, CuraScript contends that, because Torrent cannot prove loss, KPI #9 is inapplicable. This "damages" argument is a prelude to others, all of which the Court will address—and reject—below. For now, it suffices to say that CuraScript conflates the question of its liability with the question of damages. A failure to adduce evidence of contractual damages does not mean the breach did not happen.

CuraScript, as a sophisticated entity, could have drafted the Logistics Agreement to include all the terms and conditions it advances today. It did not. Accordingly, the Plaintiffs' summary judgment motion is granted and CuraScript's summary judgment motion is denied.

---

[107] *See Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) (Contact parties cannot use litigation to extract "contractual protections they failed to secure for themselves at the bargaining table."), *aff'd*, 861 A.2d 1251 (Del. 2004).

**C. No party is entitled to summary judgment on Count II's damages element.**

CuraScript is liable for Torrent's product damage. CuraScript's liability, in turn, triggers the Hold Harmless Provision, putting one Defendant at risk for the loss. Recognizing this, the Defendants devote the bulk of their efforts to attacking the Plaintiffs' damages. The Defendants' arguments fall into two categories: inadmissible evidence of damages and failure to mitigate damages. Neither supports summary judgment.

**1. The Plaintiffs have admissible evidence of (nominal) damages.**

It is undisputed that Torrent's products were at least superficially damaged by the May Leak. CuraScript took photos that prove it. Nevertheless, the Defendants insist that they are entitled to summary judgment because the Plaintiffs do not have "admissible evidence" of their actual damages.[108] But the Defendants' inadmissibility arguments are based on an incomplete record. And the Plaintiffs' nominal damages are enough to defeat summary judgment anyway.

**a. The spreadsheet is not necessarily inadmissible.**

To price the damaged products, the Plaintiffs proffered a spreadsheet detailing the products' wholesale cost.[109] A Torrent representative testified at a deposition

---

[108] *See generally Kennedy v. Giannone*, 1987 WL 37799, at *1 (Del. June 16, 1987) (stating general rule that a party opposing summary judgment cannot create a factual dispute using inadmissible evidence).

[109] *See* Ex. O to D.I. 101 (Spreadsheet).

that the spreadsheet was taken from Torrent's purchase register.[110]  The purchase register is a catalog that lists the wholesale value of Torrent's products.

The Defendants call the spreadsheet an inadmissible hearsay document that was prepared solely for this litigation.  Maybe it is; maybe it is not.  No one knows because the Defendants failed to ask any follow-up questions about the purchase register.[111]  The Court will not grant a summary judgment motion that is premised on "speculation or conjecture" or evidence "potentially possible."[112]

The Court also may deny summary judgment where the factual record surrounding an issue is unclear.[113]  On these limited facts, the spreadsheet appears to be a record kept in the ordinary course of Torrent's business that may be authenticated at trial by a Torrent witness.[114]  If the spreadsheet is not hearsay, then its credibility would be a question of weight, not admissibility.  "[I]ssues of the weight of the evidence, as distinct from its admissibility, are for the jury."[115]  They are not for summary judgment.

---

[110] *See* Ex. N to *id.* (Dep.).

[111] *See id.*

[112] *Rochester v. Katalan*, 320 A.2d 704, 708 n.7 (Del. 1974).

[113] *E.g.*, *Alexander Indus.*, 211 A.2d at 918–19; *Ebersole*, 180 A.2d at 468–69.

[114] *See* Del. R. Evid. 803(6).  The Torrent representative testified, albeit somewhat inarticulately, that the purchase register is kept in the ordinary course of business. Ex. 2 to D.I. 98 at 118 (Dep.).  The Defendants did not investigate this point.

[115] *Hall v. State*, 788 A.2d 118, 124 (Del. 2001).

At bottom, there is a "strong preference . . . for admitting evidence[,]" like the spreadsheet, "that will assist the trier of fact."[116] The Defendants' choice not to ask questions at the deposition does not show otherwise. The spreadsheet may ultimately be inadmissible at trial. But the Court will not reward the Defendants' strategic decision to avoid developing the record with a pre-trial ruling that assumes the record is complete. The Defendants' motions as to admissibility are denied.

### b. The Plaintiffs are not required to establish a precise amount of damages at this stage.

Further, the Defendants' admissibility arguments are beside the point. Assuming the spreadsheet is inadmissible, it remains undisputed that Torrent suffered at least nominal damages. That is enough to survive summary judgment.

Expectation damages "should not act as a windfall."[117] But "the injured party need not establish the *amount* of damages with precise certainty" if "the *fact* of damages" is established instead.[118] After all, "a plaintiff need not plead monetary damages to sustain a breach of contract claim. The plaintiff need only plead causally related harm, which the plaintiff can accomplish by pleading a violation of the

---

[116] *Norman v. All About Women, P.A.*, 193 A.3d 726, 730 (Del. 2018).

[117] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (internal quotation marks omitted).

[118] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015) (first emphasis added) (internal quotation marks and citations omitted).

plaintiff's contractual rights."[119]  Although mathematical uncertainty complicates financial planning, "[p]ublic policy has led Delaware courts to show a general willingness to make a wrongdoer bear the risk of uncertainty of a damages calculation . . . ."[120]  Even where damages have not been quantified with precision, a court still may infer nominal damages from a contractual injury.[121]

"Doubts about the extent of damages are generally resolved against" the breaching party.[122]  This principle operates on summary judgment.  On summary judgment, the non-movant "need only present some credible evidence . . . that supports a claim for damages."[123]  Even if damages will be "difficult to prove" at trial, a lack of "precise damages [does] not justify summary judgment."[124]

---

[119] *See Garfield v. Allen*, --- A.3d ----, 2022 WL 1641802, at *24 (Del. Ch. May 24, 2022).

[120] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (internal quotation marks omitted), *aff'd sub nom.*, *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

[121] *See* Restatement (Second) of Contracts § 346(2) & cmt. b (Am. L. Inst. 1981).

[122] *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *16 (Del. Ch. Sept. 19, 2017) (alteration and internal quotation marks omitted).

[123] *In re Cencom Cable Income Partners*, 1997 WL 666970, at *12 (Del. Ch. Oct. 15, 1997).

[124] *Unit, Inc. v. Ky. Fried Chicken Corp.*, 304 A.2d 320, 332 (Del. Super. Ct. 1973), *overruled on other grounds by Mann v. Oppenheimer & Co.*, 517 A.2d 1056 (Del. 1986).  *See* Del. Super. Ct. Civ. R. 56(c) ("A summary judgment . . . may be rendered on the issue of liability alone although there is a genuine issue as to the *amount* of damages." (emphasis added)); *cf. Blue Cube Spinco LLC v. Dow Chem. Co.*, 2021 WL 4453460, at *14 (Del. Super. Ct. Sept. 29, 2021) (denying motion to dismiss based on alleged failure to plead a specific amount of damages because "[i]n some sense, all complained-of damages are 'speculative' until the true amount emerges in discovery and ultimately is set at trial").

The Plaintiffs have offered some credible evidence that, "though disputed," supports nominal damages.[125] Courtesy of CuraScript, the Plaintiffs have photos depicting water damage to the exterior of Torrent's products.[126] That damage indisputably was caused by the May Leak. Moreover, Underwriters offer a document indicating that they paid Torrent's insurance claim.[127] The Plaintiffs' damages "may be difficult to prove" at trial, but any inability to calculate a specific dollar amount of damages at this stage does not support the Defendants' motions.[128]

Importantly, however, this ruling cuts both ways. If a plaintiff "establishes the fact of loss in contract, but not its actual amount," the plaintiff may recover only nominal damages.[129] Here, the Plaintiffs' alleged damages figure—$265,110—is disputed,[130] based on potentially inadmissible evidence, and ultimately may be

---

[125] *In re Cencom Cable Income Partners*, 1997 WL 666970, at *12.

[126] CuraScript has argued that Torrent's decision to discard its wet products after-the-fact negates any inference that the products were damaged in the first place. *See, e.g.*, D.I. 99 at 7. This argument is difficult to follow and in any event, is refuted by CuraScript's own photography. The Court will not on summary judgment "draw unreasonable inferences in favor of" CuraScript. *Elenza, Inc. v. Alcon Labs. Holding Corp.*, 183 A.3d 717, 721 (Del. 2018) (internal quotation marks omitted).

[127] Although this document was produced post-discovery, the Defendants did not object to its presence in the record. To the contrary, when asked if Torrent's insurance claim impacted the case, CuraScript called the issue "irrelevant" and Denali never responded. D.I. 135 at 1.

[128] *Unit, Inc.*, 304 A.2d at 332.

[129] *USH Ventures v. Glob. Telesys. Grp., Inc.*, 796 A.2d 7, 23 (Del. Super. Ct. 2000).

[130] The Plaintiffs also allude to damages "in excess of $265,110." D.I. 137 ¶ 16. CuraScript thinks this means that the Plaintiffs will seek additional "lost sales" damages. The "in excess" language appears empty. There is no plain reference to consequential damages anywhere in the complaint. *Cf.* Del. Super. Ct. Civ. R. 8(a).

reduced to a nominal total or eliminated entirely by a failure to mitigate. So the Plaintiffs are not entitled to summary judgment on their amount of damages either.

**2. Any failure by Torrent to mitigate its damages is a fact question that the Defendants, not the Plaintiffs, must prove at trial.**

As a separate basis for summary judgment, the Defendants argue that the Plaintiffs cannot recover damages because Torrent discarded all its wet products without first determining whether any of those products were salvageable. In other words, the Defendants request summary judgment on the ground that the *Plaintiffs* have not shown reasonable efforts to mitigate their losses. This gets things backwards. A failure to mitigate is a defense—not an affirmative element of proof— and so the burden to establish a setoff rests on the Defendants, not the Plaintiffs.[131] A party cannot be faulted for failing to meet a burden belonging to someone else.

---

And the Plaintiffs' prayers for relief demand no more than $265,110. D.I. 137 ¶¶ 22, 26, 31. The $265,110 is the insured amount and seems to represent the replacement value of the products calculated using an annual average. *See* Ex. 2 to D.I. 98 at 108:18–23 (Dep.).

KPI #9 allows replacement value. It does not speak to the proper methodology for calculating replacement value. CuraScript is free to challenge Torrent's valuation model and the understanding with which Underwriters provided coverage. Either way, these are questions of weight, not admissibility.

[131] *E.g.*, *Richardson v. Christiana Care Health Servs., Inc.*, 2021 WL 2566736, at *7 (Del. Super. Ct. June 21, 2021); *BTG Int'l*, 2017 WL 4151172, at *20; *Tanner v. Exxon Corp.*, 1981 WL 191389, at *4 (Del. Super. Ct. July 23, 1981); *see also TIFD III-X LLC v. Fruehauf Prod. Co., L.L.C.*, 883 A.2d 854, 860 n.15 (Del. Ch. 2004).

Moreover, mitigation is a fact issue.[132] The Plaintiffs have presented some evidence suggesting that Torrent had no choice but to discard all its products. And the Defendants have presented some evidence suggesting that some of those products could have been salvaged. The Defendants are free to argue to the jury that "Torrent has no evidence that the product was actually unsalvageable[.]"[133] At this stage, however, the Court merely detects factual disputes; it does not decide them.[134]

### 3. CuraScript's Reg 211.208 arguments lack merit.

Undeterred, CuraScript last contends that the Plaintiffs cannot show that Torrent's decision to discard its products was reasonable because the Plaintiffs have not proffered expert testimony on whether the products were improperly stored within the meaning of Reg 211.208. CuraScript misreads the regulations.

Recall that, under Reg 211.208, improperly stored drug products must be discarded. Improper storage may result from environmental or chemical damage caused by equipment failures.[135] Here, Riser 6 leaked on Torrent's products. This indisputably was an equipment failure that caused Torrent's products to become wet. Under these circumstances, the record supports a reasonable inference that Torrent would have faced regulatory liability if it chose to reintroduce its products into

---

[132] *E.g.*, *Gutridge v. Iffland*, 2005 WL 3454129, at *4 (Del. Dec. 15, 2005).
[133] D.I. 99 at 8 (emphasis omitted).
[134] *See, e.g.*, *GMG Cap.*, 36 A.3d at 783.
[135] 21 C.F.R. § 211.208.

circulation.[136]  Drug makers are not required to play "Russian Roulette" with FDA by selling unsanitary prescription drugs to consumers.[137]  A jury thus could find that Torrent's decision to discard its products was reasonable.

The jury does not need an expert's help to reach that conclusion.  To contend otherwise, CuraScript cites *Eli Lilly & Co. v. Air Express International USA, Inc.*[138] for the proposition that expert testimony is required in all Reg 211.208 cases.  But *Eli Lilly* said no such thing.  In *Eli Lilly*, the United States Court of Appeals for the Eleventh Circuit merely noted that the plaintiff manufacturer called an expert to explain the effects of sub-freezing temperatures on insulin.[139]  The Eleventh Circuit did not hold that the manufacturer was *required* to produce an expert.

Moreover, the manufacturer in *Eli Lilly* chose to undertake salvaging operations.  Under Reg 211.208, drug products "*may be*" salvaged if the owner so chooses, but salvaging is not required.[140]  Nor could it be.  Improperly stored drug products violate GMP.[141]  And pharmaceuticals packed or held in violation of GMP are presumed to be unfit for sale.[142]  Given the presumption of unmarketability, a

---

[136] *Id.* § 210.1(b).

[137] *Am. Home Assur. Co. v. Merck & Co., Inc.*, 386 F. Supp. 2d 501, 519 (S.D.N.Y. 2005) (internal quotation marks omitted).

[138] 615 F.3d 1305 (11th Cir. 2010).

[139] *Id.* at 1317.

[140] 21 C.F.R. § 211.208 (emphasis added).

[141] *See id.* §§ 210.1(b), 211.1(a).

[142] *See* 21 U.S.C. § 333(c); 21 C.F.R. § 210.1(b); Carter, *supra* note 19, at 339.

manufacturer cannot salvage improperly stored products unless those products first pass laboratory testing.  Put differently, only when salvaging is elected must the products undergo a fitness test that may or may not require expert explanation.

Here, Torrent chose not to salvage its products.  Whether that decision was reasonable is an issue of mitigation that the Defendants bear the burden to prove.  Indeed, CuraScript is the one who argues that product testing would have been appropriate under these circumstances.  CuraScript's reasoning, if accepted, would mean that CuraScript would need an expert, not the Plaintiffs.

In addressing the question of salvageability, Torrent's lay personnel are permitted to testify as to the bases for their interpretations of and reliance on Reg 211.208.[143]  Although an expert probably would have strengthened the Plaintiffs' case, "[n]umerous courts have refused" to prevent "private parties" from explaining their own understanding of a "complex regulatory scheme[.]"[144]  Accordingly, a jury will determine whether Torrent's decision to discard its products was reasonable.  An expert is not necessary for proving the Plaintiffs' damages.

In sum, no one is entitled to summary judgment as to Count II's damages element.  The parties' motions are denied.

---

[143] *See Am. Home Assur. Co. v. Merck & Co., Inc.*, 462 F. Supp. 2d 435, 453–54 (S.D.N.Y. 2006) (rejecting argument that expert testimony is required to explain the proper application of Reg 211.208).
[144] *Id.* at 453 (internal quotation marks omitted).

**D. Neither Defendant is entitled to summary judgment as to its crossclaim.**

Finally, the Court turns to the Defendants' indemnification dispute. This dispute turns on the proper interpretation of the Lease. The Lease specifies that Ohio law governs its terms.[145] "Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."[146] The Court previously found a material relationship between Ohio and this dispute because all the relevant events occurred at the Warehouse.[147] So Ohio law applies.

Ohio courts give effect to contracting parties' mutual intent by enforcing their agreement according to its plain meaning.[148] "When the language of a written contract is clear," Ohio courts "look no further than the writing itself . . . ."[149] Ohio law deems a contract ambiguous only if its language is "susceptible to two or more conflicting, yet reasonable interpretations."[150] "It is not the responsibility or function

---

[145] Lease § 28.
[146] *J.S. Alberci Constr. Co., Inc. v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000).
[147] *Torrent*, 2020 WL 6066275, at *1.
[148] *E.g.*, *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).
[149] *Lubrizol Advanced Materials, Inc. v. Nat'l Union Fire Ins. Co.*, 160 N.E.3d 701, 703 (Ohio 2020) (internal quotation marks omitted).
[150] *Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*, 102 N.E.2d 579, 584 (Ohio Ct. App. 2017).

of [an Ohio] court to rewrite the parties' contract to provide for a more equitable result" or to prevent "a hardship upon one of the [contract] parties."[151]

Although Ohio law controls the substance of the Defendants' dispute, Delaware law applies to the procedural issues.[152] On summary judgment, the Court cannot choose between two reasonable interpretations of ambiguous contract language.[153] "[W]here reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence. In those cases, summary judgment is improper."[154]

**1. Determining whether either Defendant is the responsible for Torrent's product damage involves factual issues related to causation and extrinsic evidence that are inappropriate for resolution on summary judgment.**

As they did earlier in the case, the Defendants focus their motions on the Maintenance Provision. CuraScript contends that Denali must indemnify CuraScript because Denali failed to replace Riser 6 entirely before the May Leak occurred.

---

[151] *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (internal quotation marks omitted).

[152] *See, e.g.*, *Chaplake Holdings, Ltd. v. Chrysler Corp.*, 766 A.2d 1, 5 (Del. 2001); *US Dominion, Inc. v. Fox News Network, LLC*, 2021 WL 5984265, at *18 (Del. Super. Ct. Dec. 16, 2021); *see also* Restatement (Second) of Conflict of Laws § 122 & cmt. a (1971). Delaware law also will govern the question of remedy unless the appropriate remedy is bound closely to Ohio substantive law. *See generally Naughty Monkey LLC v. Marinemax Ne. LLC*, 2010 WL 5545409, at *8 n.59 (Del. Ch. Dec. 23, 2010) (summarizing applicable principles and collecting authority).

[153] *E.g.*, *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334 (Del. 2012).

[154] *GMG Cap.*, 36 A.3d at 783 (citations omitted).

Denali counters that it had no duty to replace Riser 6 because its flaws were caused by CuraScript's own negligent repair work.

The Defendants' focus on the Maintenance Provision overlooks the language of the Hold Harmless Provision. The Hold Harmless Provision sets the standards under which a breach of the Maintenance Provision could trigger indemnification. Those standards assume that one party is the proximate or but-for cause of the product damage. A breach of the Maintenance Provision may amount to a but-for cause. But the undisputed facts do not establish breach-based causation, let alone a clear sense of what the parties meant by "repair" or "replace."

Under the Hold Harmless Provision, CuraScript must indemnify Denali for product damage that "arises directly from" CuraScript's "acts or omissions in connection with [its] use or occupancy of the" Warehouse.[155] At first blush, the Hold Harmless Provision uses the same term—arising from—as KPI #9. But one thing stands out. Unlike KPI #9, the Hold Harmless Provision applies only if the product damage arises *directly* from CuraScript's conduct.

That difference matters. Under Ohio law, the term "arising out of" "affords very broad coverage" and "does not require that conduct be the proximate cause of

---

[155] Lease § 15.

the injury[.]"[156]  But "'direct cause' and 'proximate cause' are regarded as equivalents" by Ohio law.[157]  So by inserting the word "directly," the parties added a "but for" causation requirement.[158]  It is not sufficient under the Hold Harmless Provision for CuraScript's conduct to bear only some loose connection to the harm.

The same is true for Denali.  Under the Hold Harmless Provision, Denali must indemnify CuraScript for product damage that is "occasioned by" Denali's "fault or negligence."[159]  "Occasioned" means "caused."[160]  Negligence requires proof of but-for causation.[161]  So Denali's conduct must be the but-for cause of the damage too.

The Maintenance Provision confirms the parties' intent to condition their indemnification duties on but-for causation.  Under the Maintenance Provision, Denali must replace all mechanical systems unless the basis for the replacement

---

[156] *Stickovich v. Cleveland*, 757 N.E.2d 50, 69 (Ohio Ct. App. 2001), *appeal denied*, 758 N.E.2d 1148 (Ohio 2001).  As discussed earlier, Delaware law understands "arising" language the same way.  *See supra* Analysis § B.

[157] *McNees v. Cincinnati St. Ry. Co.*, 89 N.E.2d 138, 143 (Ohio 1949).

[158] *See Tye v. Beausay*, 156 N.E.3d 331, 339 (Ohio Ct. App. 2020) ("Causation is established using the but for test . . . ." (internal quotation marks omitted)); *Directly*, *Black's Law Dictionary* (11th ed. 2019) (defining "directly" as ""in a straightforward manner," "in a straight line or course," and "immediately"); *see generally Athens v. McClain*, 168 N.E.3d 411, 419 (Ohio 2020) ("In determining the common or ordinary meaning of [undefined] words," Ohio courts "may look to dictionaries." (internal quotation marks omitted)).

[159] Lease § 15.

[160] *Occasion*, *Merriam-Webster* (online ed.), https://www.merriam-webster.com/dictionary/occasion (last visited Aug. 1, 2022).

[161] *See Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989); *Cincinnati Bell Tel. Co. v. J.K. Meurer Corp.*, 185 N.E.3d 632, 639 (Ohio Ct. App. 2022).

"arises due to" CuraScript's "fault or negligence."[162] The same "fault or negligence" language qualifies Denali's indemnification duties, which also hinge on but-for causation. The Court must interpret identical terms the same way.[163]

A proximate or but-for cause requirement may have narrowed the field of indemnifiable claims. But it also precludes summary judgment for two reasons.

First, proximate cause is "almost always" a jury issue.[164] Indeed, proximate cause is "fact-driven" and so "is to be determined, *on the facts*, upon mixed considerations of logic, common sense, justice, policy and precedent."[165] The Court cannot grant summary judgment on an issue reserved for the jury.

And second, undisputed facts do not show that one of the Defendants was the but-for cause of the May Leak. CuraScript has presented evidence that, for example, (i) CuraScript timely notified Denali of each leak; (ii) Denali repeatedly ignored its requests to replace Riser 6 entirely; (iii) Denali's plumber said that Riser 6 needed a full replacement; (iv) inspection was long overdue; and (v) CuraScript could not

---

[162] Lease § 5.

[163] *See, e.g.*, *Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 956 (Del. 2005) ("[T]he record contains no persuasive evidence that the parties intended that identical terms in their contract would be given disparate meanings. Generally, and absent evidence calling for a different result, all parts of a contract must be read in harmony to determine the contract's meaning, with one portion of a contract not being read to negate a different portion.").

[164] *Mazda Motor Corp. v. Lindahl*, 706 A.2d 526, 533 (Del. 1998).

[165] *Duphily v. Del. Elec. Coop., Inc.*, 662 A.2d 821, 830 (Del. 1995) (internal quotation marks omitted).

inspect Riser 6 without disabling a pump located in a facility only Denali may access. Denali responds with evidence that, for example, (i) CuraScript failed to conduct routine repairs on Riser 6, causing it to deteriorate; (ii) Denali timely addressed each leak; and (iii) Denali replaced whole segments of Riser 6 before the May Leak.

Some of this evidence seems strong, some less so. But the Court cannot grant summary judgment just because it is "skeptical that [one side] will ultimately prevail."[166] All that matters is whether there is evidence that, if proven, would show one or both Defendants acted negligently. There is.

Nor does the Maintenance Provision, by itself, support summary judgment. The Maintenance Provision says that CuraScript must repair the sprinklers and Denali must replace the sprinklers. But it does not define the terms repair or replace. And it does not specify the times when a mechanical system would need maintenance at all.

The Defendants effectively concede these ambiguities. Instead of construing the Maintenance Provision, the Defendants concentrate on their course of performance. CuraScript stresses the number of e-mails it sent to Denali about fully replacing Riser 6 and the fact that Denali's plumber recommended a full replacement. For its part, Denali points to evidence in which CuraScript appears to

---

[166] *Cerberus Int'l*, 794 A.2d at 1150.

acknowledge that CuraScript could have done more to maintain Riser 6 before it started leaking.

All this is extrinsic evidence. On summary judgment, the Court cannot consider extrinsic evidence of contractual intent or select among two reasonable interpretations of disputed contract language. The Defendants may argue their expectations for, and understandings of, their respective duties to the jury. They are not entitled judgment as a matter of law. Accordingly, their motions are denied.

## 2. Expert testimony is not required to prove general negligence.

In a last gasp, Denali argues that the CuraScript's negligence cannot be proven without expert testimony, which CuraScript did not secure. The Court disagrees.

"There is no rule requiring expert testimony and a [claimant] is not required to present expert testimony in all cases in order to prevail."[167] Expert testimony is *permitted* when it is relevant and will be helpful.[168] But expert testimony is not *required* unless the matter "is not within the common knowledge of laymen[.]"[169]

---

[167] *Brown v. Dollar Tree Stores, Inc.*, 2009 WL 5177162, at *3 (Del. Super. Ct. Dec. 9, 2009) (alteration and internal quotation marks omitted). *See* 1 McCormick on Evidence § 12, Westlaw (8th ed. database) (last updated July 2022) ("On some subjects . . . expert testimony is required . . . . [M]ore commonly the question is whether expert testimony is permissible on a certain subject." (citations omitted)).

[168] *E.g.*, *Pavey v. Kalish*, 2010 WL 3294304, at *3 (Del. Aug. 23, 2010).

[169] *Money v. Manville Corp. Asbestos Disease Comp. Tr. Fund*, 596 A.2d 1372, 1375 (Del. 1991) (internal quotation marks omitted). *See* Del. R. Evid. 702(a).

General negligence typically is not one of those matters.[170]  And this case is no exception.  It does not take an engineering degree to determine whether a leaking pipe needs to be repaired or replaced.  The jury will review all the evidence surrounding the May Leak and determine whether someone was at fault.  Denali's motion is denied.

## CONCLUSION

For the foregoing reasons: (1) the Plaintiffs' motion for summary judgment is **GRANTED IN PART** (*i.e.*, as to CuraScript's liability under Count II) and **DENIED IN PART** (*i.e.*, as to Count II's damages element and Counts I & III); (2) CuraScript's motion for summary judgment against the Plaintiffs is **GRANTED IN PART** (*i.e.*, as to Count I) and **DENIED IN PART** (*i.e.*, as to Count II); (3) CuraScript's motion for summary judgment against Denali is **DENIED**; (4) CuraScript's motion *in limine* is **DENIED**; (5) Denali's motion for summary judgment "on the issue of causation" is **GRANTED IN PART** (*i.e.*, as to Counts I

---

[170] *E.g.*, *Polaski v. Dover Downs, Inc.*, 2012 WL 3291783, at *2 (Del. Aug. 14, 2012) (stating rule); *Ward v. Shoney's, Inc.*, 817 A.2d 799, 802–03 (Del. 2003) (reversing trial court on ground that expert testimony is not required to state a *prima facie* case of ordinary negligence); *see Donovan v. Wawa, Inc.*, 2017 WL 4675755, at *2–3 (Del. Super. Ct. Oct. 17, 2017) (applying rule and finding expert not required); *Yancy v. Tri State Mall Ltd. P'ship*, 2014 WL 2538805, at *3–4 (Del. Super. Ct. May 29, 2014) (same); *Small v. Super Fresh Food Mkts., Inc.*, 2010 WL 530071, at *3–4 (Del. Super. Ct. Feb. 12, 2010) (same).

& III) and **DENIED IN PART** (*i.e.*, as to indemnification); and (6) Denali's motion for summary judgment "on the issue of damages" is **DENIED**.

      **IT IS SO ORDERED**.

Charles E. Butler, Resident Judge